# Financial Adviser Pleads Guilty to Fraud

A financial adviser that authorities said stole more than $8.6 million from investors has pleaded guilty to fraud charges.

Joe Jones pleaded guilty to 41 counts of securities violations and five counts of obtaining property by false pretense. He was sentenced to between 20 and 26 years in prison.

"Joe Jones is one of the worst financial crooks in North Carolina history, and this week we got to see that, no matter how well
you spin a web of lies around your victims, law enforcement can unravel it," Secretary of State Elaine Marshall said in a statement.

Investors in Rocky Mount and the surrounding region invested millions with Jones with the understanding that their money would be invested in concert promotions with a company called BAB Productions. State securities investigators found that Jones used the money from later investors to repay earlier investors in a classic Ponzi scheme.

"Sadly, most of the money in this case appears to be gone, leaving little chance of these investors getting their money back. But we hope that this guilty plea and the substantial prison sentence will give them some measure of satisfaction," Marshall said.

Some of Jones' clients have filed an arbitration claim against the company under which he operated, Investors Capital Corp., to try to get some of their money back.

Copyright 2007 by WRAL.com. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.



EXHIBIT
A

## A relationship that can make all the difference

**In a world of rapidly changing markets and complicated legislative issues, choosing to work with a financial advisor is one of the wisest decisions you can make. Your advisor can help you determine the right investments for you or your company's plan and, depending on your situation, identify educational opportunities. Even experienced investors may benefit from the counsel of an advisor who can bring timely information and expertise.**

**So whether you are investing for yourself or your company, build a strong partnership with a financial advisor. Together, you can make a solid investment plan even better.**

Seven-time winner of the DALBAR triple crown



Industry-leading service is an integral part of what sets Putnam Investments apart from other mutual fund companies. At Putnam, more than 3,000 employees are dedicated to advisor and shareholder service functions. Putnam is a 14-time winner of the DALBAR award for Mutual Fund Service Excellence and a 7-time winner over the past 16 years of the DALBAR triple crown, receiving all three awards — for service to investors, to financial advisors, and to variable annuity contract owners.

*This information should not be considered tax or investment advice. Please consult your tax or financial advisor regarding your particular circumstances and before making any investment decisions.*

*Investments in mutual funds are not guaranteed and involve risk of loss.*

***Investors should carefully consider the investment objectives, risks, charges, and expenses of a fund before investing. For a prospectus or an offering statement containing this and other information about any fund, please call 1-877-888-401k. Read the prospectus or offering statement carefully before making any investment decisions.***

# What makes Putnam different?

### A time-honored tradition in money management
Since 1937, our values have been rooted in a profound sense of responsibility for the money entrusted to us.

### A prudent approach to investing
We use a research-driven team approach to seek consistent, dependable, superior investment results over time, although there is no guarantee a fund will meet its objectives.

### Funds for every investment goal
We offer a broad range of mutual funds and other financial products so investors and their advisors can build diversified portfolios.

### A commitment to doing what's right for investors
We have below-average expenses and stringent investor protections, and provide a wealth of information about the Putnam funds.

### Industry-leading service
We help investors, along with their financial advisors, make informed investment decisions with confidence.

Putnam Corporate Plans and Services
One Post Office Square
Boston, Massachusetts 02109
1-800-225-1581

**www.putnam.com**



**EXHIBIT**

Case 5:07-cv-00386-H Document 32 Filed 10/05/07 Page 2 of 31

A guide to fiduciary risk
management for sponsors
of participant-directed
defined-contribution plans

# Putnam 401(k)
# FIDUCIARY
# PLANNING GUIDE

**EXHIBIT**

C

# CONTENTS

## PART I: THE BASICS

Who is a "fiduciary?" ...................................................................................................2
What are the roles and responsibilities of a fiduciary? ................................................4
ERISA Section 404(c) ...................................................................................................8
Prohibited transaction rules .........................................................................................9

## PART II: FOCUS ON INVESTMENTS

A general perspective on fiduciary responsibility for investments ...............................10
Investment lineups ....................................................................................................10
Selecting and monitoring the funds in the investment lineup .....................................15
The role of investment education and advice ............................................................16

## PART III: BEST PRACTICES IN MANAGING FIDUCIARY LIABILITY

Identifying fiduciaries and assigning roles and responsibilities ....................................17
Establishing investment and administrative committees ..............................................17
Establishing operating procedures for the committees ...............................................19
Investment policy statements ....................................................................................20
Identifying and using outside experts .......................................................................21
Selecting and monitoring plan service providers .......................................................22
Establishing procedures for transmission of employee contributions ..........................23
Satisfying ERISA bonding requirements ....................................................................23
Obtaining fiduciary liability insurance .......................................................................24

## PART IV: WHAT PUTNAM CAN DO FOR YOU

Relationship management services ............................................................................25
Legal, compliance, and consulting services ...............................................................25
Investment education services ...................................................................................25

# The New Focus On Fiduciary Responsibility

Although the investment atmosphere has constrained the performance of 401(k) investments in recent years, it has yielded a by-product that may elevate fiduciary standards. The U.S. economy has struggled to make solid gains, and equity markets have been mainly static, causing many participants to experience only modest growth or even losses in their plan accounts. Adding to this uncertainty have been highly publicized corporate scandals that, among other things, have undermined the accounts of 401(k) participants invested in the stock of those companies. Increasingly, lawyers are bringing lawsuits on behalf of plan participants against fiduciaries — including the company executives responsible for running 401(k) plans — suing to recover losses incurred by 401(k) plan participants. And, right behind the private litigators are agents from the Department of Labor, investigating fiduciary matters armed with the big "stick" of government enforcement.

Not surprisingly, these events have drawn the focus of many plan sponsors toward issues of fiduciary responsibility and the need to reduce risk in this area. Although the events giving rise to this increased attention to fiduciary issues are unfortunate and unwelcome, the focus on fiduciary issues is salutary and long overdue. At Putnam, we believe that plan sponsors should make an active commitment to their role as plan fiduciary. The Putnam approach does not seek to *minimize* exposure absolutely through an attempt to avoid fiduciary status in the first place. Rather, fiduciaries reduce risk by *managing* their role as fiduciaries and thus sponsoring a plan that provides the highest likelihood that participants will achieve their investment goals.

To make this active commitment possible, you must have both an appreciation of the roles and responsibilities of a fiduciary and an understanding of the practical steps you can take to fulfill these roles and responsibilities. This guide is designed as a primer for understanding the issues facing plan sponsors as fiduciaries, and provides practical solutions to the most common challenges. The guide is supplemented by a number of specific tools, including a Fiduciary Responsibility Checklist, a sample Investment Policy Statement and Checklist, and an ERISA Section 404(c) Checklist. And remember that the guide is only a starting point. Professionals at Putnam and its affiliated companies have a wealth of experience in dealing with fiduciary issues and, in their role as administrative services providers to your plan, are in a unique position to assist you. In short, our approach is designed to help you embrace your responsibilities as a fiduciary, while managing risk.

This guide has been prepared for clients of Putnam for informational purposes only. The summaries of legal matters or recommendations for action are general in nature and are not intended to provide authoritative guidance or legal advice. You should consult your own attorney, consultant, or financial or other advisor for guidance on your plan and your company's particular situation.

## PART I: THE BASICS

# Who is a "fiduciary?"

This is a simple question and, for plan sponsors at least, there is a straightforward answer: As the entity responsible for overseeing your plan's operation, you are a fiduciary.

However, the simplicity of the answer is misleading. ERISA sets out a flexible scheme that permits assignment of responsibility to various parties associated with retirement plans, *not just the plan sponsor*. Individual employees and officers of the plan sponsor can be fiduciaries, even if this was not intended. In addition, service providers and other outside parties may be plan fiduciaries.

However, we do not believe identifying plan fiduciaries needs to be a complicated exercise. By keeping a few basic principles in mind, this can be a relatively easy "first step" in reviewing fiduciary compliance.

---

### What is the basis for ERISA fiduciary responsibility?

In 1974, Congress enacted the Employee Retirement Income Security Act — known as ERISA — to give employees specific statutory rights to protect their pensions and retirement savings. ERISA responded to abuses that had occurred within pension plans by imposing strict standards of fiduciary behavior on persons administering plans and investing plan assets, and by providing mechanisms for enforcing these standards. Participants have the right to sue plan fiduciaries directly for failing to live up to the fiduciary standards. In addition, the Department of Labor has the authority to investigate and bring enforcement action, in court or administratively, against fiduciaries for violations of fiduciary duty.

If found to be in violation of a fiduciary duty, the fiduciary is personally liable for the losses resulting from the violation. In addition, the Department of Labor can impose a 20% civil penalty based on the losses. Fiduciaries — very likely including executives in your organization — have a direct and personal financial interest in making sure matters of fiduciary responsibility are taken seriously.

---

### HOW YOU BECOME A FIDUCIARY

You become a fiduciary under ERISA in one of two ways: (1) by assuming one of three specifically designated roles under ERISA (think of this as "fiduciary by title"); or (2) by taking an action that is fiduciary in nature (think of this as "fiduciary by act").

### FIDUCIARY BY TITLE

ERISA defines three roles that make you a fiduciary of the plan — two roles are required to exist under an ERISA plan, and one is optional:

**Named fiduciary.** ERISA requires that every plan have a "named fiduciary" who is the party with *the authority to control and manage the operation and administration of the plan*. Either the named fiduciary can be specifically stated in the plan (for example, by name, title, or role), or the plan can provide a procedure by which the plan sponsor appoints the named fiduciary. A plan can have more than one named fiduciary, with different persons responsible for different roles (e.g., plan administration versus plan investments). In virtually all cases, the plan sponsor itself or someone appointed by the plan sponsor is a named fiduciary.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 6 of 31

**Trustee.** ERISA also requires the assets of every retirement plan be held in trust by a "trustee." A trustee can either be a *discretionary trustee* or a *directed trustee*.

- A *discretionary* trustee has the exclusive authority and discretion to manage and control the assets of the plan.
- A *directed* trustee has no authority or discretion to manage or control the assets of the plan, and takes all direction from a named fiduciary.

**Investment manager.** A plan may, but is not required to, have one or more "investment managers." This is a qualified entity or individual (but not a trustee or named fiduciary) who has been given the power to manage some or all of the assets under the plan. An investment manager must acknowledge, in writing, that it is a fiduciary of the plan. (Note that, by definition, under ERISA, managers of mutual funds are not "investment managers" and are not plan fiduciaries merely by virtue of managing the mutual funds.)

---

*Are institutional trustees of defined contribution plans usually discretionary or directed trustees?*

Virtually all institutional trustees of participant-directed plans serve as *directed* trustees. The exclusive authority to manage and control the assets of the plan remains with the plan's named fiduciary, ordinarily the plan sponsor, and the trustee's role is limited to holding assets and following directions of the named fiduciary. When Putnam is the trustee of a 401(k) plan, it always acts as a *directed trustee*.

---

*Is the manager of a mutual fund an investment manager under ERISA?*

No. The ERISA definition of investment manager applies to the management of "plan assets." Under ERISA, the shares of a mutual fund are considered plan assets, but the individual stocks, bonds, and other securities held *inside* the mutual fund are not. Because it is managing the securities *inside* the mutual fund, the mutual fund manager technically is not managing plan assets. Therefore, it is not an investment manager or a fiduciary of the plan for purposes of ERISA. Congress made this distinction because mutual funds are already subject to their own extensive body of regulation. (Note that managers who manage securities held by a plan in a separate account or under a group trust, rather than a mutual fund, are managing plan assets and are considered ERISA investment managers.)

---

## FIDUCIARY BY ACT

In addition to the three defined fiduciary roles, ERISA treats as a fiduciary anyone who exercises any discretionary authority or control respecting management of the plan or its assets, or exercises any discretionary authority or responsibility in administration of the plan. Since this definition focuses on the actual exercise of control and not a person's formal title, ERISA is often described as having a "functional" definition of fiduciary. Thus, even if someone has not been formally designated as a fiduciary, that person can be considered a fiduciary by his or her actions.

### A FIDUCIARY — BUT ONLY FOR "FIDUCIARY FUNCTIONS"

A person's role as a fiduciary does not necessarily extend to all areas of his or her involvement with the plan. A person who is a fiduciary can act in other capacities — wearing different hats, if you will — that do not involve being a fiduciary. If you are not wearing your fiduciary hat, your actions are not governed by ERISA's fiduciary rules.

This is a particularly important concept for plan sponsors. Certain decisions that you make about the plan are made in your capacity as an employer, including the decision to establish the plan, the level of benefits, the vesting schedule, etc. These types of decisions are called "settlor" functions because they relate to the employer's role in creating (or, in trust law, "settling") the trust, and not as fiduciary managing the trust. Settlor decisions are not subject to, and cannot be challenged, under ERISA's fiduciary rules.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 7 of 31

### NON-FIDUCIARY ADMINISTRATIVE FUNCTIONS

In administering a plan, fiduciary status requires some exercise of discretion. Purely ministerial functions, done within a framework of rules and policies established by others, are not fiduciary functions. Therefore, routine clerical or recordkeeping functions, including maintaining account balances, processing transactions, and computing service or compensation credits, do not involve the exercise of discretion and are therefore not fiduciary in nature.

---

*Who are NOT fiduciaries in the typical participant-directed plan?*

**Recordkeepers** — performing ministerial functions that are non-fiduciary in nature

**Custodians** — in addition to individual or institutional trustees, a plan may have a custodian who takes custody of certain assets of the plan. A custodian's functions are generally viewed as ministerial and non-fiduciary in nature

**Investment/financial advisors** — While advisors play a valuable role in the establishment and maintenance of a plan, their assistance to plan sponsors in selecting investment options usually would not be considered "investment advice" for purposes of ERISA, so they generally will not be plan fiduciaries

**Lawyers, accountants, employee benefits consultants, and other professionals** — usually act in a non-fiduciary capacity

# What are the roles and responsibilities of a fiduciary?

Once the various fiduciaries associated with a plan are identified, the next important step is to understand their roles and responsibilities. Since the plan sponsor is at the top of the fiduciary structure, the plan sponsor should know not only its own role as a fiduciary but also the roles of all other fiduciaries for the plan.

In general, a fiduciary is only responsible for the jobs assigned to it. For example, a committee given responsibility only for discretionary administration of the plan, will not be responsible for selecting plan investments. However, it is extremely important that these responsibilities be assigned to the various parties in writing, in the plan documents, or according to procedures described in the plan documents.

---

*Is a fiduciary responsible for the acts of another fiduciary?*

In general, one fiduciary is not responsible for the acts of another. However, there is one exception to this rule — known as "co-fiduciary liability." This occurs when:

• One fiduciary participates knowingly in the breach of duty by the other fiduciary.

• The fiduciary breaches its own duty, enabling the other fiduciary to violate ERISA.

• One fiduciary knows about the other fiduciary's breach and fails to take reasonable efforts to remedy the breach.

The threshold for co-fiduciary liability is quite high, requiring actual knowledge or participation in the other fiduciary's violation. Nevertheless, when a breach occurs a plaintiff's lawyer is likely to sue all of the plan's fiduciaries, hoping to hold them all responsible under the theory of co-fiduciary liability.

---

### THE ROLES OF PLAN FIDUCIARIES

The structure for assigning fiduciary responsibility described on the following page is typical for a participant-directed defined contribution plan.

**Plan sponsor.** The plan sponsor is at the top of the fiduciary structure. In general, as plan sponsor, you are ultimately responsible for making sure all the fiduciary jobs get done and for determining what fiduciary jobs will be assigned to other parties. There are two main categories of fiduciary activities that are the ultimate responsibility of the plan sponsor:

- *Plan administration*
  - *Interpreting the plan terms*
  - *Making discretionary decisions regarding claims for benefits and appeals of denied claims*
  - *Selecting service providers to administer the plan*
  - *Ensuring that the plan is operated in accordance with its terms*

- *Plan investments*
  - *Determining the investment structure for the plan*
  - *Selecting and monitoring the individual investment funds in the plan*
  - *Complying with the requirements of ERISA section 404(c), if the plan is a 404(c) plan*

Plan sponsors often rely upon the skills and expertise of advisors to evaluate plan administration and plan investment activities. It is also possible to delegate these jobs to other parties. The degree to which you can escape ultimate responsibility for the performance of these jobs varies. In addition, the selection of another party to carry out these jobs is itself a fiduciary function that must be done according to — and that will be judged by — the standards of fiduciary responsibility.

**Plan committees.** Plan sponsors often assign administrative and investment functions to one or more committees, typically made up of officers or other employees. There are two approaches to committee assignment:

*(1) The committee can be the "named fiduciary" under the plan, in which case the plan sponsor is technically liable as fiduciary only for selection of the committee members and monitoring their performances. The committee members themselves are otherwise responsible as fiduciaries for their own actions and decisions.*

*(2) The plan sponsor may retain the role of "named fiduciary" but appoint a committee to carry out its responsibilities. In this case, the plan sponsor is fully responsible for the actions and decisions of the committee, as are the committee members themselves. Under this approach, your selection of the committee would be an element in "procedural prudence."*

Some plan sponsors do not use formal committees and instead rely on certain individuals or other less formally organized groups of employees. In this case, the plan sponsor is virtually always the "named fiduciary" and so remains fully responsible for the decisions and actions of these individuals. Even if the plan sponsor is "named fiduciary" and fully responsible for administrative and investment duties, we believe "procedural prudence" is better served by appointing a formal committee for these roles.

Some practitioners believe it is preferable to designate a plan committee as "named fiduciary." This is because, at least as a technical matter, it makes the plan sponsor (and usually the board of directors, acting for the plan sponsor) responsible only for the selection of the committee and not its decisions. Other practitioners favor designating the plan sponsor as "named fiduciary," making it, rather than the individual committee members, the chief target in any fiduciary lawsuit. There is no obvious right choice. You should discuss with your ERISA counsel the approach that best suits your situation.

---

*Does it really matter whether the plan sponsor or the committee is the named fiduciary?*

Probably not. Most plan sponsors will hold committee members harmless from any personal financial liability or loss, except perhaps if the committee member acted unlawfully or in bad faith. Therefore, with limited exceptions, the plan sponsor ultimately bears the cost of any fiduciary claims.

---

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 9 of 31

# PART I: THE BASICS

**Trustee.** In the world of participant-directed 401(k) plans, the job of the trustee is rather limited from a fiduciary perspective. The trustee's role is to hold the assets of the plan, investing and distributing them as directed by the plan's "named fiduciary." Provided the directions it receives do not violate ERISA or the terms of the plan, the trustee must follow the directions it receives. Nevertheless, under ERISA the "directed trustee" is still a fiduciary and, under some recent case law and Department of Labor pronouncements, the directed trustee's role may be greater than traditionally understood, especially where a plan holds company stock. As the law evolves, focus has turned upon the issue of what circumstances, if any, require a directed trustee to question or refuse to follow the directions of the named fiduciary; and on the issue of under what conditions a directed trustee will be deemed to have knowledge of a plan sponsor's breach of fiduciary duty and will have to take action to avoid co-fiduciary liability.

**Financial or investment advisor.** In most cases, advisors provide services that are not of a fiduciary nature. In rare cases, advisors may provide fiduciary services to the plan sponsor in the form of advice or on the choice of plan investment lineup. Some plans retain a financial or investment advisor to provide fiduciary-level investment advice to participants in selecting investments for their individual accounts. In either case, you should treat the selection of the advisor as a fiduciary decision.

**Investment manager.** An ERISA "investment manager" may be retained to invest plan assets in a separate account within the plan. The plan may also invest in a group trust, the manager of which would be considered an ERISA investment manager. In these cases, the investment manager is responsible for investment of these assets alone. The plan sponsor or other named fiduciary would be responsible for selecting and monitoring the performance of the investment manager.

---

### Can a plan sponsor shift responsibility for selecting investments to a third party?

The only way to shift responsibility for selecting the fund lineup away from the plan sponsor to a third party is to appoint an investment manager, as defined by ERISA, to take on this job. It is quite rare for an ERISA investment manager to be appointed for this purpose.

---

## THE RESPONSIBILITIES IMPOSED ON ALL PLAN FIDUCIARIES

While ERISA has a flexible structure for establishing the roles of plan fiduciaries, the law sets forth universal standards for their behavior. These standards are much higher than the law generally imposes on an employer's relations with its employees. In fact, they are among the highest standards of conduct prescribed anywhere in the law. A fiduciary's failure to perform its job up to the high level these standards require is called a "breach" of fiduciary responsibility and may mean personal liability for the fiduciary.

Although the standards of fiduciary responsibility are high, they do not impose specific, concrete requirements. On the contrary, the rules are stated in the broadest and most generalized form. This is one of the things that makes fiduciary compliance seem challenging. ERISA sets out a series of strict legal dictates, almost moral in character, but without a definitive roadmap for meeting these standards.

We do not believe this challenge is as daunting as it might at first seem. The emphasis of ERISA's fiduciary standards is on the "how." This means procedure and process are the keys. There is no specific benchmark against which performance is measured. Since procedure and process can be managed — and adapted to your specific situation — complying with ERISA's fiduciary standards is a task that plan sponsors can realistically achieve.

**The Prudent Man Rule.** ERISA requires that a fiduciary discharge its duties:

> *"with the care, skill, prudence and diligence under the circumstances…*
> *that a prudent man acting in a like capacity and familiar with such matters would use."*

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 10 of 31

This rule is technically no more important than the other fiduciary standards, but it deserves special prominence in any discussion of fiduciary responsibility. It is the rule that is hardest to define in concrete terms and the standard on which fiduciaries are most open to challenge. On the other hand, it is a standard where fiduciaries can take the most proactive steps to satisfy the rule and avoid liability. Key points to know about this rule:

- *This is often described as the "Prudent Expert Rule," since it requires the fiduciary to act with the care of not just any "prudent man," but one "familiar" with the matters at hand. This means, at a minimum, that fiduciaries making a fiduciary decision should be — or should make themselves — knowledgeable about the subject matter of the decision.*

- *Much of the emphasis of this rule — evident in the terms "care," "skill," and "diligence" — is on procedure. Fiduciaries are required to do the things a careful, deliberate, knowledgeable, diligent person would do, such as investigating facts, asking questions, consulting experts, considering alternatives, etc. To be sure, judgment is needed at the end of any decision-making process, but following the process conscientiously is more than half the battle.*

- *What this rule does not require of fiduciaries is a specific result or even success. The fact that with "20/20 hindsight" a fiduciary would have made a different decision does not mean the Prudent Man Rule has been violated. As long as the actions were taken deliberately and prudently at the time, the fiduciary will have met its responsibility.*

**"Procedural Prudence."** Developing and following procedures for making fiduciary decisions, and documenting compliance with the procedures, reduce the risk of liability for violating the Prudent Man Rule. A documented procedure may be the only way to show that a decision that has a bad outcome was in fact reached through a process that a prudent man would have followed. More importantly, a well-thought-out process for decision-making will generally lead to better decision-making, meaning less basis for participant complaint or challenge. Because of the importance of procedure when dealing with the Prudent Man Rule, this guide emphasizes "procedural prudence" when addressing the concrete steps plan sponsors should take. This is discussed in more detail in "Best Practices."

### What is the origin of the Prudent Man Rule?

ERISA's Prudent Man Rule is the modern version of the rule first enunciated in American law in 1830 by Massachusetts Justice Samuel Putnam, ancestor of the founder of Putnam Investments. The common law prudent man rule required "faithful conduct and the exercise of sound discretion" by trustees investing the money of others.

**The Exclusive Benefit Rule.** ERISA requires that a fiduciary discharge its duties:

> *"solely in the interest of participants and beneficiaries"* and *"for the exclusive purpose of providing benefits... and defraying the reasonable expenses of administering the plan."*

In short, fiduciaries must put the interests of plan participants before all other interests. Key points to know about this rule:

- *It imposes a duty of complete loyalty to plan participants.*
- *The "interest" in question is the interest* as a retirement plan participant, *not as an employee.*
- *A plan sponsor or fiduciary can receive an incidental benefit, as long as the* primary motivation *for the fiduciary's action is to benefit participants.*
- *Any decision involving a potential conflict of interest is subject to special scrutiny.*

While compliance with the Exclusive Benefit Rule is not so easily achieved through process and procedure, the rule provides a clear mandate: in fiduciary decision-making, *always put participants first.*

**The Investment Diversification Rule.** ERISA requires fiduciaries to:

> *"diversify the investments of the plan so as to minimize the risk of large losses, unless... it is clearly imprudent to do so."*

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 11 of 31

This rule may seem somewhat out-of-place in a participant-directed 401(k) plan, since it assumes that the fiduciary controls how the assets of the plan are invested. However, this rule can be relevant in a number of ways:

- *Not all plan investments are participant-directed.*
- *In a section 404(c) plan, the plan sponsor is responsible for selecting a broad range of investments that includes diversified options.*
- *The diversification of the underlying investment funds should also be considered.*

For 401(k) and most other defined contribution plans, investments in company stock are not subject to the Investment Diversification Rule. Some plans, such as ESOPs, can be 100% invested in company stock because they do not need to comply with the Investment Diversification Rule. However, even in an ESOP, company stock investments are still subject to the fiduciary standards of the Prudent Man Rule and the Exclusive Benefit Rule.

**The Plan Document Rule.** ERISA requires that a fiduciary discharge its duties:

> *"in accordance with the documents... governing the plan insofar as such documents... are consistent with [ERISA]."*

Key points to know about this rule:

- *Fiduciaries must follow the terms of the plan documents, which include any trust agreement. If there is any ambiguity in the documents requiring interpretation, this is the responsibility of the plan sponsor.*
- *Plan documents cannot be followed where the action is contrary to ERISA. While the terms of a plan document will, by themselves, rarely violate ERISA, their application to particular fact situations could be a violation.*
- *This rule could convert any plan operational failure into a potential claim for fiduciary breach.*

---

**Do you avoid fiduciary responsibility for company stock as an investment option when it is required by the terms of the plan?**

When company stock is an investment in a plan, this feature is often hard-wired into the plan document. Since plan design decisions are "settlor" functions and not fiduciary functions, it could be argued that the decision to *offer* company stock as an investment is not open to challenge from a fiduciary perspective. However, the exception in the Plan Document Rule that prohibits a fiduciary from following a plan document provision that is not "consistent" with ERISA could result in plan sponsors remaining responsible as fiduciaries. Exactly *when* it becomes imprudent — and, therefore, an ERISA violation — to keep company stock in a plan contrary to clear plan terms is an issue now in the courts.

---

# ERISA Section 404(c)

Remember, the general rule is that the "named fiduciary" of a plan has full responsibility for operation and administration of the plan. There is an important exception to this rule under ERISA section 404(c), for plans in which investments are participant-directed:

ERISA section 404(c) states that a plan fiduciary will not be held responsible for any losses resulting from participants' direction of investment of assets in their account. To take advantage of section 404(c), the plan must satisfy certain operational and disclosure requirements. There are some key points to know about:

- *Even if section 404(c) applies, the plan sponsor or other named fiduciary has fiduciary responsibility for the selection and monitoring of the investment options available under the plan.*
- *Section 404(c) is often called "transactional" in nature. Failure to meet a requirement for one transaction does not necessarily mean that 404(c) protection is lost for the entire plan.*
- *The view of the Department of Labor is that 404(c) only applies to transactions where participants exercise active control over their accounts. Because of this, where "default" funds are used when participants fail to provide investment instructions (as in the case of automatic enrollment), 404(c) may not apply, and the plan sponsor will have responsibility for results of the participant's investment in the default fund.*

---

**What happens if a participant-directed plan does not comply with ERISA section 404(c)?**

The fiduciaries could still argue that the particular investment decisions were prudent and resulted in adequate diversification — in other words, the fiduciary standards were met. However, as a best practice, all participant-directed plans should take advantage of section 404(c) to provide fiduciary protection against participant allocation decisions.

---

**ERISA section 404(c) requirements.** The basic requirements for ERISA section 404(c) protection are:

- *The plan must offer a "broad range" of investment options (at least three) with materially different risk and return profiles.*
- *Participants must be able to change investments with a frequency appropriate in light of the volatility of the investment options.*
- *Participants must be provided certain specific information intended to permit them "to make informed investment decisions." Some of this information has to be provided automatically, and some only at the request of a participant.*

Because the requirements of ERISA section 404(c) are so detailed, we have included a separate "ERISA Section 404(c) Checklist," which provides a more complete description of the 404(c) requirements.

# Prohibited transaction rules

In addition to general standards applicable to fiduciaries, ERISA identifies certain categories of transactions that have a high likelihood for abuse, such as the potential for self-dealing, conflicts of interest, and "kickbacks." ERISA includes blanket prohibitions on fiduciaries and other parties associated with a plan from engaging in these "prohibited transactions." These rules are subject to a complex scheme of exemptions, created by Congress and the Department of Labor, intended to allow plans to function on reasonable terms. Any transaction that has the potential for self-dealing or a conflict of interest deserves special scrutiny and perhaps advice of legal counsel to ensure compliance with the prohibited transaction rules.

## PART II: FOCUS ON INVESTMENTS

The issues that require the most attention by the plan sponsor as fiduciary, and that have the greatest potential financial exposure, involve investment of the plan's assets. In a defined contribution plan, participants bear all of the investment risk. Therefore, plan fiduciaries are a likely target of a lawsuit when expectations are not met.

# A general perspective on fiduciary responsibility for investments

Some plan sponsors approach fiduciary decisions as something to be avoided at all costs. The theory behind this approach is: "The less I have to do as a fiduciary, the less anyone can find fault with." But, for example, in a participant-directed plan, the design with the least responsibility for the plan sponsor would involve unlimited investment choices (i.e., no responsibility for selecting and monitoring investments) and no investment advice offered to participants (i.e., no fiduciary responsibility for selecting and monitoring an investment advisor). However, this is also a plan that is most likely to result in bad investment choices by many participants.

Thus, while minimizing liability is a worthwhile goal, we believe that approaching fiduciary compliance by trying to minimize the plan sponsor's role in decision-making is counterproductive. By offering a 401(k) plan to its employees, a plan sponsor is necessarily signing on to be a fiduciary. We believe the most effective way to manage this liability is to commit to an active approach that *embraces* the role of fiduciary and seeks to balance the responsibility with potential liabilities. An active approach has a number of advantages:

- *Cultivating its fiduciary role by developing and following procedures will put the plan sponsor in the best position to demonstrate how it has carefully discharged its fiduciary roles and responsibilities.*
- *Active and engaged participation in the fiduciary decision process can lead to better results, promoting the most important goal of sponsoring a plan — enhancing the retirement savings of participants.*
- *Better results for participants mean less basis for complaint and fewer reasons for participants to file suit.*

Therefore, assuming a broader role in the end can provide plan sponsors the best chances of success in reducing their exposure to fiduciary liability. The services of an investment or financial advisor can provide the plan sponsor valuable assistance to make this happen.

# Investment lineups

## CONSTRUCTING THE INVESTMENT LINEUP

The most important investment responsibility of the plan sponsor is constructing the plan's investment lineup. This is a multi-step process:

- *Choosing the asset classes to be represented in the plan*
- *Deciding whether any specialized investment options should be included to supplement the asset classes chosen (such as prediversified portfolios or company stock)*
- *Selecting the individual funds to fit in the selected asset classes or specialized investment options*

*My service provider required me to include a certain percentage of its own funds in the lineup — but if I don't have a choice, why should I have fiduciary responsibility?*

In a "bundled" service arrangement, selecting the service provider really cannot be separated from selecting investment options for the plan. This is because these arrangements typically require some minimum portion of the plan's assets be invested in investment funds offered by the service provider. Therefore, in such a case the selection of the plan's administrative services provider must be considered a fiduciary decision from the *investment* perspective, not just as a choice of administrative service provider.

## THE INVESTMENT LINEUP — CHOOSING THE ASSET CLASSES

Modern investment theory indicates that asset allocation, rather than selection of particular investments, is the key to long-term investment success. The plan sponsor, generally acting through the investment committee, should focus on the range of choices necessary to permit participants to achieve appropriate asset allocation. Two competing considerations about fiduciary liability should guide this choice:

- *Offering an expansive range of options across most or all combinations of asset classes may offer the best protection, since it gives participants the greatest range of options to meet their needs.*

- *Too many funds can often end up increasing the exposure to fiduciary liability. A large number of funds may become too difficult for some investment committees to monitor adequately and too overwhelming for participants to use successfully.*

Therefore, the investment lineup needs to strike a balance.

### SECTION 404(c)

The starting point should be to ensure compliance with the "broad range" requirement of ERISA section 404(c), requiring three diversified options with materially different risk/return characteristics. It is generally understood this requires diversified funds representing the following general asset classes:

- *Capital preservation (i.e., money market or stable value)*
- *Equities (i.e., common stocks)*
- *Fixed income (i.e., bonds)*

### BEYOND SECTION 404(c)

ERISA section 404(c) should just be the starting point, however. Most investment experts would recommend offering far more than the three asset classes specified by section 404(c). Participants should have access to those assets classes in order to be able to achieve more complex asset allocation strategies and therefore a fully diversified portfolio. This means plan investment lineups should include asset classes chosen across the risk/return spectrum and reflecting a range of other investment attributes. The full range of possibilities can be seen in the following charts:

Equity 

Fixed income 

# PART II: FOCUS ON INVESTMENTS

Including every entry on the matrix of asset classes — particularly when also considering international versus domestic securities — could end up unworkable for both participants and the investment committee. The investment committee needs to select among the asset classes, choosing the range and number of options appropriate to the plan population. A more investment savvy population or one with ready access to investment advice or guidance tools may be given a wider range of options, and a less informed population should be given a more limited, core set of options.

## THE INVESTMENT LINEUP — ADDING SPECIALIZED INVESTMENT OPTIONS

### PREDIVERSIFIED INVESTMENT OPTIONS

For many participants, the opportunity to fashion their own asset allocations may not be desirable. Even with sound investment education practices, many participants do not feel they are up to the task of adopting an investment strategy that will lead to long-term success. Without other options, such participants may simply rely on the plan's most conservative funds as a safe haven for their savings. At the other end of the spectrum, some participants might try to seek success opportunistically, chasing performance to reach their goals rather than taking a reasoned asset allocation approach. And even participants who start with an asset allocation strategy often fail to take actions to rebalance their account, either as they get closer to retirement or in response to market activity that puts their account out of balance.

An effective solution to these problems is to include prediversified investment options within the investment lineup. These funds or models are intended to provide participants a convenient, "all-in-one" option for obtaining an asset allocation suitable to their needs. By choosing a pre-diversified option, the participant is essentially turning over his or her account to a professional asset manager, leaving it up to the professional to seek optimal diversification across asset classes. Rebalancing is done within the fund or within the account, relieving the participant of this burden. These options come in two basic types, each with its own variations:

- *Risk-based options — These are designed to achieve an asset allocation consistent with broadly defined risk profiles, such as Conservative, Moderate, and Aggressive. Participants choose which profile suits them best, based on risk tolerance, age, and other factors, and invest accordingly.*

- *Age-based options — These are designed to achieve an asset allocation consistent with a specific time horizon remaining until the participant's retirement, with the asset allocation shifting toward a more conservative posture over time. Typically, these products are structured with multiple funds covering multi-year bands (e.g., 5, 10, 15 years, etc., remaining to retirement).*

If prediversified investment options are offered, it is important that participants are encouraged to use them as an "all-in-one" option, as combining these with other funds can end up defeating the desired asset allocation strategy. A sound ongoing communications strategy, which includes printed materials and employee meetings, is key to educating employees about the strategy of prediversified investment options.

---

*Does a prediversified option involve more risk to the plan sponsor, from a fiduciary perspective?*

As with each designated investment option in a 401(c) plan, the plan sponsor has fiduciary responsibility for selecting and monitoring a prediversified option. While a strategy encouraging participants to "put all their eggs in one basket" may seem risky, it really should be looked at as a solution for reducing exposure. Participants who sign on to this approach are more likely to be successful in the long run than participants who, without the skills or discipline to adopt and maintain their own asset allocation strategy, struggle to manage their accounts properly.

---

## COMPANY STOCK

Including company stock in the plan's investment lineup is, in large measure, a plan design decision. When company stock is offered, the plan usually specifies it as an investment option. In fact, the law *requires* that ESOPs — whether as "stand-alone" or as part of another plan — be invested *primarily* in company stock. The reason most plan sponsors offer company stock is to motivate employees by aligning their financial interests with those of the company. While a valid business reason, this is not a *fiduciary* consideration for offering company stock in the plan.

If a design decision has been made to offer company stock, the plan sponsor must still be able to conclude *as a fiduciary* matter that company stock is a prudent investment for the plan. If it is not, then fiduciary responsibility must override the plan design decision.

Exactly when company stock is or becomes an *imprudent* investment is something that the courts continue to consider, mostly expanding the fiduciary roles and exposure of plan sponsors and their directors, officers, and other employees. Guidance in this area is still particularly difficult, but it is possible to make a few general observations:

- *The greatest fiduciary exposure does not necessarily come from making company stock a required, rather than an optional, investment. Rather, it comes from over-concentration in company stock. After all, if it is not a prudent investment, section 404(c) does not offer protection anyway. Over-concentration raises the absolute dollar exposure to liability and undercuts a participant's chances for success through a diverse asset allocation strategy.*

- *However, high company stock balances are not automatically bad. At the plan level, this might be appropriate if, for example, the plan sponsor also offers a pension plan. At the participant level, it might be suitable for someone who has other savings where the plan is just part of a diversified portfolio.*

- *Plan-imposed limits on amounts invested in company stock would avoid over-concentration in the plan. However, effective investment education — with a consistent message of diversification — can largely achieve the same goal without unnecessarily restricting participants.*

- *In any situation in which the financial condition of the plan sponsor is precarious, in the wake of recent court decisions regarding Enron, WorldCom, and other cases, the fiduciary duties of plan sponsors and their officers and directors may be expanded significantly. For example:*

  — *In applying the Prudent Man definition, a fiduciary is required to act as would an investment professional with all available information — which may include "inside information" — and corporate "insiders" who are plan fiduciaries may have a duty to inform participants of inside information that is relevant to the investment decision to buy or hold stock.*

  — *Fiduciaries may not rely on the presumption of prudence that some courts have found in ERISA for company stock investment, but must show that they affirmatively considered the prudence of continued investment in company stock.*

- *The prudence required to be exercised in the appointment of trustees, committee members, and other fiduciaries can also extend to a duty to* monitor *the activities of the appointed fiduciaries "at reasonable intervals."*

---

### Are there steps that can be taken to minimize exposure of directors and officers in the present climate?

Yes, although whether these measures will be effective has not been tested. The regulatory and judicial expansion of the responsibilities of plan sponsors has led some practitioners to recommend measures such as allocating discretionary management and investment authority to less senior employees or to independent third parties (i.e., to persons less likely to have inside information about the company); sponsoring plans at a subsidiary level, where it is less likely material information about the company will reside; specifying in the plan document that appointments of fiduciaries will be made by a specific officer or officers (and not by directors); constituting a plan administration committee in the document, made up of specific corporate officeholders; and setting out and following explicit procedures for monitoring the prudence of the company stock investment (regular meetings, special meetings when the stock price drops significantly or news unfavorable to the stock price is learned, use of independent advisors, etc.)

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 17 of 31

# PART II: FOCUS ON INVESTMENTS

## SAMPLE INVESTMENT LINEUPS

Here are samples of investment lineups designed to meet specific goals and accommodate different types of participant populations, while striking the balance between an expansive range and a workable number for participants:

| INVESTMENT LINEUPS | |
|---|---|
| **Sample 1 — SIMPLE** | **Sample 2 — ADVANCED** |
| **Tier 1** | **Tier 1** |
| Prediversified | Prediversified |
| **Tier 2** | **Tier 2** |
| Money market/stable value | Money market/stable value |
| Bond/income | Bond/income |
| Large–cap value | Large–cap value |
| Large–cap growth | Large–cap core |
| Small/mid–cap core | Large–cap growth |
| International | Mid–cap growth |
| | Mid–cap value |
| | Small–cap growth |
| | Small–cap value |
| | International |
| | **Tier 3** |
| | Mutual fund window/self–direct brokerage |

# Selecting and monitoring the funds in the investment lineup

The final step in constructing the plan's investment menu is to choose the individual funds that will fill in the investment lineup. This process will then be repeated periodically as part of the Retirement Committee's ongoing monitoring role.

The exact approach the Retirement Committee will use when selecting the investments will vary among plan sponsors, with the following as a sample approach:

**Universe evaluation** — The general process should evaluate a universe of funds in the specific asset class, subjecting the universe to levels of screening to narrow the search. The ultimate goal should be to identify funds for each asset class that exhibit characteristics consistent with the mandate for the asset class. In this task, independent research tools (such as commercially available research services), as well as the services of a financial advisor, can be used to identify potential investments for further evaluation.

**Quantitative screening process** — The universe should be screened to help identify funds or managers appropriate for each asset class based upon multiple criteria:

- *Minimum track record/asset levels — Generally, a minimum of three years of relevant history for the product would be acceptable. A minimum amount of assets managed within the specific product/style (e.g., $250 million) should also be set to ensure appropriate levels of liquidity/diversification.*
- *Correlation — to style benchmark or peer group to ensure consistency in profile with the desired asset class. This evaluation should be analyzed over multiple time periods.*
- *Performance — multi-period and relative to a style benchmark and peer group with additional consideration for risk-adjusted performance. While a track record of successful and consistent performance is an important factor, it should be only one piece of the evaluation process.*
- *Holdings evaluation — Portfolios should be analyzed to detect investments that are inconsistent with the style being evaluated.*
- *Costs — Each investment vehicle should be available at reasonable cost to the plan or its participants.*

**Qualitative screening process** — Supplementing the screening based on quantitative criteria should be a consideration of qualitative factors to narrow the field.

- *Organizational — Fiduciaries must understand the capabilities and overall health and stability of firms sponsoring products being considered.*
- *Investment process — When possible in the final steps of the screening process, management of the products being considered for selection should be evaluated. Fiduciaries should seek to understand the underpinnings of the process (e.g., investable universe, security selection criteria/techniques, research, portfolio construction objectives/constraints, risk management, etc.) and the people involved and their capabilities/roles.*

The process used for monitoring is not considerably different in terms of criteria that should be considered. Also, plan fiduciaries should strive to keep channels of communication open with the selected funds' companies to ensure that any important changes or other major events involving the funds are communicated promptly. Here are some additional things to keep in mind in terms of the ongoing monitoring process:

- *Monitoring should be done periodically — A comprehensive annual review, coupled with quarterly checkups, is best*
- *Performance evaluation — This should be measured against appropriate benchmarks/peer groups and evaluated for consistency with objectives set forth in the investment policy statement.*

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 19 of 31

- *Performance attribution — Fiduciaries should also seek to understand the sources of performance over the time period under review. Analysis should focus on the components of the portfolio that added value and those that detracted from results and the rationale behind portfolio decisions.*
- *Portfolio positioning — Fiduciaries should consider how the portfolio is currently positioned and why. Also, what are expectations for performance given the macroeconomic landscape?*
- *Organization — Stability of the organization should be monitored with a focus on whether or not there have been any changes to the organization, and if so, how they might affect performance and the organization moving forward.*
- *Process/people — Any changes to the investment teams or capabilities should be monitored. Have there been any changes to the process and/or have there been any departures or hires that will affect the product?*

# The role of investment education and advice

As we have emphasized, a main goal of "managing the investment process" is to promote participants' success in achieving their retirement savings goals. Even if that means stepping up to greater fiduciary responsibility, the point is that participant success can provide plan sponsors the *best protection* against fiduciary liability. And, of course, a well-managed plan investment process can go a long way toward this result, by making sure participants have access to a sound, comprehensive investment lineup.

Moreover, providing participants with tools to make them better able to use the plan's investment lineup will do even more to promote participants' success. The key tools are those that will enable them to take the investment lineup and create asset allocation strategies appropriate to their specific needs —such as either investment education or investment advice.

The goals of effective investment education and investment advice are basically the same: to lead participants to diversify their accounts according to the asset allocation strategy that is best for them. Investment education can take various forms and, in its most interactive forms, can closely resemble — *without becoming* — what ERISA would consider, "investment advice." From a fiduciary perspective, the key difference between the two is this: one who gives ERISA "investment advice" is a plan fiduciary, and giving investment advice is a fiduciary act — while providing investment education is not a fiduciary act, and the party providing the education is not a fiduciary. This raises two important points regarding fiduciary liability and investment advice:

- *When the advice is being given by a third party, the plan sponsor is responsible, as a fiduciary, for the selection and monitoring of the investment advisor. However, it is otherwise not responsible for the results of the advice.*
- *The investment advisor is fully responsible for its advice, even if the plan otherwise satisfies Section 404(c).*

---

### Is there an obligation to provide investment education or advice?

Though it is subject to debate among practitioners, we do not believe the plan sponsor has a fiduciary duty to provide participants either investment advice or investment education. Nevertheless, to repeat, we believe that providing participants with these tools, as outlined in a comprehensive education and communications strategy, can help protect against fiduciary liability in the long run.

---

## PART III: BEST PRACTICES IN MANAGING FIDUCIARY LIABILITY

This section outlines specific strategies for enhancing fiduciary compliance and reducing exposure to fiduciary liability.

# Identifying fiduciaries and assigning roles and responsibilities

**Goal** — To make sure all the appropriate roles are covered; be aware whose performance and activities you will need to monitor.

**Action** — Identify plan fiduciaries and establish their roles and responsibilities. This should be done within your organization and for parties associated with the plan who are unrelated to you.

### GUIDELINES/OBSERVATIONS

- Who is or will be a "named fiduciary" of the plan is a matter of plan design, touching on matters of corporate liability that should be decided in consultation with legal counsel.
- Options generally are to designate as named fiduciary either the plan sponsor or a committee designated by the plan sponsor (rarely, though occasionally, a single individual will be designated).
- Variations may include dividing administrative versus investment roles of the named fiduciary between the plan sponsor and a committee or between different committees. For example:
  - *Plan sponsor is administrative-named fiduciary and committee is investment-named fiduciary*
  - *Separate "administrative committee" and "investment committee" in respective named fiduciary roles*
- An appropriate trustee of the plan is usually already in place with an institution, such as Putnam, serving as a directed trustee. With the trustee selected (itself a fiduciary decision by the named fiduciary) you only need to ensure the trust agreement properly reflects the roles and responsibilities of the various fiduciaries.
- A financial advisor or consultant assisting the named fiduciary generally will not be acting itself in a fiduciary capacity. However, any arrangement with the investment professional should be reviewed to confirm this, to be sure whether any fiduciary monitoring of this party's actions is required.

# Establishing investment and administrative committees

**Goal** — To promote procedural prudence by formally installing a group of competent individuals with clear fiduciary roles or responsibilities.

**Action** — Establish and appoint the members of one retirement plan committee or of separately constituted investment and administrative committees. If the plan sponsor, rather than a committee, is named fiduciary, establish procedures for appointment of committees to act on behalf of the plan sponsor.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 21 of 31

# PART III: BEST PRACTICES IN MANAGING FIDUCIARY LIABILITY

### GUIDELINES/OBSERVATIONS

- Regardless of whether the plan provides a committee structure for the named fiduciary or whether the plan sponsor is technically named fiduciary, we believe procedural prudence is best served by establishing committees for fiduciary decision-making.

- Though not legally necessary, we believe it can be helpful to have separate committees for the respective administrative and investment roles of the named fiduciary. Remember that fiduciaries are held to a Prudent "Expert" Standard. Since the investment and plan administrative roles may require different expertise and experience, having the most appropriate membership for each committee may mean selecting different individuals.

- It is best to use executive-level decision-makers who can act independently, without necessarily consulting with superiors. At the same time, selection should take a realistic account of the time commitment the individuals will be able to give to the committees. And, if company stock is to be offered as an investment option in the plan, the fiduciary's possible obligation to use or disclose inside information about the company might also be relevant to the selection of committee members.

- Many employers with multiple divisions or business units represented in a plan find it desirable to include representation across divisions or business units.

- Many plan sponsors find it useful to include a member of the plan sponsor's legal department to serve as committee secretary or clerk and to offer legal input as needed.

### SPECIFIC TO AN INVESTMENT COMMITTEE OR SUB-COMMITTEE

- Members of the committee should generally have experience and expertise in investment matters. Thus, for example, one or more individuals from the plan sponsor's treasury or finance areas should be included on the committee.

- Though perhaps having less investment expertise, members from the human resources or employee relations areas are also essential. Since the plan's investments must cater to the nature and needs of the specific workforce, people with the most firsthand knowledge should be included.

- Management for other, unrelated, areas may be helpful to act as a "sanity" check, to question the others' assumptions and to make them justify what might otherwise just be seen as conventional wisdom.

### SPECIFIC TO AN ADMINISTRATIVE COMMITTEE OR SUB-COMMITTEE

- A plan sponsor will often have already established a committee responsible for deciding plan design and benefit issues. The administrative committee might be this committee or perhaps a sub-committee of the same individuals. The administrative committee might also be a sub-committee of the investment committee (or vice versa).

- It is typical that the administrative committee would delegate many day-to-day discretionary tasks to either a particular member (usually from human resources) or a trusted human resources representative who is not a member. Duties delegated might include:
  - *Making determinations regarding QDROs*
  - *Making non-routine determinations regarding eligibility, vesting, etc.*
  - *Deciding first-level formal claims for benefits*

- The main responsibilities of the administrative committee would be to establish plan-wide procedures, interpret the plan, and decide formal appeals of denied benefit claims.

# Establishing operating procedures for the committees

**Goal** — To promote procedural prudence by creating a concrete framework for fiduciary decision-making.

**Action** — Establish procedures governing how the committees will operate, in meetings and generally.

### GUIDELINES/OBSERVATIONS

- The procedures should have general terms covering items like the following:
  - *Frequency of meetings*
  - *Quorum for meetings*
  - *Procedures for calling special meetings*
  - *Voting rules (e.g., majority and "super majority" votes required to carry motions on certain issues)*
  - *Membership terms*
  - *Membership positions (e.g., chair, vice-chair, secretary, or clerk)*

- The secretary or clerk should keep minutes of the meetings. This person should also be responsible for maintaining records of the minutes, as well as any other relevant documents considered at a meeting. These records should be readily available if requested, for example, by the DOL on audit.

- It is not necessary that meetings follow "Roberts Rules of Order," but some level of formality is advisable. For example, meetings should be formally convened, attendance taken and a quorum established, prior meeting minutes approved, and motions for a vote formally introduced and seconded.

- While the responsibilities of an administrative committee suggest it will need to meet on a more *ad hoc* basis, it should meet at least once annually, essentially to review the "state of the plan."

- The procedures should recognize that individual members or sub-committees may be responsible for assuming specific investigative or fact-finding roles for report to the committee at large.

- If an investment committee is being newly formed and working with an investment policy statement, initial meetings should be frequent until either a new investment policy statement is established and first implemented, or until the existing investment policy statement and fund lineup are validated. Once the investment committee is up and running, there should be periodic meetings to review the ongoing performance of the plan's investment funds.

- All decisions, including the investigation and facts that went into the decisions and reasoning behind the decisions, must be *documented*. Keep minutes of each meeting, noting time and place, attendees, and all matters discussed and decisions reached.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 23 of 31

# Investment policy statements

**Goal** — To establish procedural prudence for investments by providing a framework for how to manage the process of selecting and monitoring the plan's investment options.

**Action** — Adopt and adhere to a written investment policy statement (IPS) that has three main purposes: to state the plan's "mission," to establish "standards," and to clearly define a "process."

### GUIDELINES/OBSERVATIONS

The style and content of the IPS varies tremendously among plan sponsors. Some are relatively brief and general in nature, while others are detailed and specific. The IPS should address at least the following:

**Mission** — A statement of the plan's general investment philosophy and how that philosophy is to be reflected in the selection of investments for the plan.

- For the typical participant-directed plan, the overall philosophy of the plan's investment lineup should be to make it possible for participants to fully diversify their accounts, in line with their retirement savings needs.
- The philosophy should take account of any needs particular to the plan's participant population.
- The overall philosophy should ultimately be reflected in the selection of asset classes for the plan's investment lineup, with these classes set out explicitly in the IPS.

**Standards** — A listing of quantitative measures and qualitative factors to be considered in selecting and monitoring the investment funds to fill out the investment lineup.

- The quantitative measures should include items like performance benchmarks, performance relative to benchmarks, time frames for reviews of performance history (for example, over 1-, 3-, 5-, and/or 10-year periods), performance volatility, and expense ratios.
- Prescribed minimums should be provided for consideration of new funds and for designation of existing funds to a "watch list."
- Qualitative measures for consideration should include items such as portfolio turnover, style consistency, and manager turnover.

**Process** — Procedures for reviewing and monitoring investments.

- The IPS should state the roles and responsibilities of the investment committee relative to the plan's investments, as well as how the committee should conduct its business.
- The IPS should provide a procedure under which investment funds performing below set standards are placed on a "watch list" for consideration to be dropped after a stated period.
- At least once a year, the investment committee should review the IPS itself, to ensure that the asset class lineup and other general aspects of the statement are still appropriate, working, and up-to-date.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 24 of 31

*What are the benefits of an investment policy statement?*

Having an IPS forcefully promotes procedural prudence. The adoption of an IPS demonstrates the care and seriousness with which the plan sponsor approaches investment issues. More important, the procedures set forth in the IPS make it easy to document the careful judgment and diligence that goes into specific investment decisions.

The process of constructing the statement is an opportunity to take a "big picture" view, allowing the development of an overall philosophy of how and what investments will be offered under the plan to make sure long-term strategic goals are not made the victim of overreaction to short-term market trends.

The IPS provides a touchstone for continuity as the individuals responsible for decision-making may change over time.

*Is a plan required under ERISA to have an investment policy statement?*

While some ERISA experts disagree over whether an IPS is legally required (we, like the majority of experts, believe it is not), most agree having one is extremely valuable. Having an IPS is a hallmark of an active, engaged fiduciary. But, a word of warning — only adopt an investment policy statement if you intend to follow it. It is probably worse to adopt an IPS that you do not follow than not to have an investment policy statement at all. That is, by establishing an investment policy statement, the plan sponsor is basically making a statement about what, in its view, is prudent behavior, and if it fails to live up to the standard it has set for itself, the plan sponsor makes it easy to be accused of a breach of its fiduciary duties of prudence and care.

An investment or financial advisor can provide valuable assistance in establishing, maintaining, and monitoring an IPS.

# Identifying and using outside experts to assist in fiduciary decision-making

**Goal** — To promote procedural prudence by filling in gaps in the fiduciaries' expertise and obtaining an independent, informed expert's view on matters.

**Action** — Identify outside experts, such as investment professionals, lawyers, auditors, and benefits consultants to assist the fiduciaries.

## GUIDELINES/OBSERVATIONS

- ERISA encourages fiduciaries to make use of experts to advise them on matters involving their responsibilities to the plan and participants. Accordingly, the plan document and any procedures developed for the activities of fiduciaries should specifically authorize the fiduciaries to employ experts.
- When selecting experts, fiduciaries should review their expertise, credentials, and references carefully. It is also important to determine whether the fees the experts charge are competitive in the market and not excessive. An investment or financial advisor should be selected with this level of care, but the advisor may, in turn, provide valuable assistance in screening and selecting other experts.

- In general, the cost of experts to assist fiduciaries in their decision-making may be charged to the plan. However, if the expert will provide services that relate to non-fiduciary matters, such as plan design, such fees may be properly chargeable not to the plan, but to the plan sponsor.

*How can you determine if fees relate to fiduciary or non-fiduciary matters?*

You should request that experts itemize all fees by the nature of the service, to assist you in allocating to the plan only those fees properly payable by the plan.

# Selecting and monitoring plan service providers

**Goal** — To promote procedural prudence by ensuring services provided to the plan are performed by competent organizations, to ensure that the plan is administered properly and that the interests of participants are well-served.

**Action** — Choose and monitor on an ongoing basis the service providers directly serving the plan and participants.

### GUIDELINES/OBSERVATIONS

- While the routine aspects of plan administration are not fiduciary functions, the plan document rule requires, as a matter of fiduciary responsibility, that the plan be administered according to its terms. This means that the selection of a service provider to assume any of the ministerial functions of plan administration is a fiduciary decision that should be approached with the requisite care and prudence.
- When selecting a service provider, industry standard practice calls for a request for proposal (RFP) process through which the provider's level of services, fees, and expertise can be assessed on a competitive market basis.
- Where administrative and investment services both are to be offered by a single provider in a "bundled arrangement," this selection process cannot be separated from the investment selection process.
- Once retained, the service provider should be subjected to ongoing review, assessing any deficiencies in the provider's performance in administering the plan. An annual review with the service provider regarding the state of the plan is advisable.
- Again, an investment or financial advisor can be extremely helpful in the process of screening and selecting service providers, as well as monitoring their ongoing performance.

Case 5:07-cv-00386-H Document 1-2 Filed 10/05/07 Page 26 of 31

# Establishing procedures to ensure timely transmission of employee contributions

**Goal** — To promote procedural prudence and avoid violating ERISA self-dealing and other rules.

**Action** — Establish a process to ensure that contributions withheld from employees' paychecks are transmitted to the trustee within the time frames required by ERISA.

### GUIDELINES/OBSERVATIONS

- ERISA regulations require that employee contributions be transferred to the plan as soon as the funds can reasonably be segregated from the plan sponsor's general assets. The outside deadline — *not* a safe harbor — is the 15th business day of the month following the month in which the employee contributions were withheld. Violation of this rule is a breach of fiduciary duty, as well as a prohibited transaction. In both cases, the offense arises from the fiduciary's self-dealing in the plan's assets.
- Coordination between a competent payroll vendor and the trustee and recordkeeper will generally permit you to implement systematic procedures that comply with the rules.

# Satisfying ERISA bonding requirements

**Goal** — To comply with ERISA bonding requirements.

**Action** — Confirm the plan has a fidelity bond as required by ERISA, and review the sufficiency of its coverage.

### GUIDELINES/OBSERVATIONS

- With certain exceptions for institutions, every fiduciary is required to be bonded. This requirement also applies not only to fiduciaries, but to all parties who "handle" plan assets. "Handling" includes any activity, beyond just physical contact, where the person's duties or activities present the risk of loss of plan assets due to fraud or dishonesty.
- The amount of the bond required is 10% of the plan assets "handled," with the maximum required amount of the bond being $500,000. In practice, plan sponsors with plans of any size obtain bonding of the maximum required amount. The cost of the bond may be paid from plan assets.
- You should contact your insurance provider for assistance with the bonding requirement.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 27 of 31

# Obtaining fiduciary liability insurance

**Goal** – To protect the plan sponsor and other fiduciaries from potential losses incurred in their role as fiduciaries.

**Action** — Obtain fiduciary liability insurance protecting both the plan and plan fiduciaries.

### GUIDELINES/OBSERVATIONS

- Although not legally required, plan sponsors are generally well-advised to obtain fiduciary liability insurance covering losses and attorneys fees incurred as a result of claims of breach of fiduciary duty. Even a plan with a strong commitment to fiduciary compliance may have to defend against suits by disgruntled participants.

- The parties to be covered by fiduciary liability insurance should include the plan, to permit the plan to be made whole in the event of a fiduciary breach, and the plan sponsor and the individual fiduciaries employed by the plan sponsor, to cover the cost of legal defense and potential liability resulting from a claim.

- The plan may be charged for the cost of fiduciary liability insurance, as long as the policy gives the insurer the right to seek recourse to collect any loss from any fiduciary who engages in a breach. However, "non-recourse riders" can be purchased by the plan sponsor that cut off the insurer's right of recourse against the fiduciary. These "non-recourse riders" are relatively inexpensive and should be viewed as essential to provide individual fiduciaries insurance protection.

- Typically, these policies do not insure against claims resulting from knowingly wrongful acts, such as fraud. You should not assume that your organization or the individual fiduciaries it employs will be covered by its existing E&O (errors and omissions) or D&O (directors' and officers') insurance policies. Coverage for ERISA plans or fiduciary liability is often excluded.

- You should consult your insurance provider about the details and suggested levels of coverage for fiduciary liability insurance.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 28 of 31

# PART IV: WHAT PUTNAM CAN DO FOR YOU

Putnam offers a wide range of services designed to provide you with the highest level of support in meeting your fiduciary obligations.

## RELATIONSHIP MANAGEMENT SERVICES

Your Relationship Manager will collaborate with you and your financial advisor to identify the fiduciary needs specific to your plan and determine areas of opportunity to improve upon your fiduciary practices. Working together, we will create a plan of action to address any deficiencies, and recommend fiduciary best practices for your consideration.

## LEGAL, COMPLIANCE, AND CONSULTING SERVICES

Your Relationship Manager also will help you take advantage of the full range of resources, including specialized legal and consulting expertise. These services can include:

- Timely updates on legislative and regulatory changes — The Legal & Compliance team monitors all legislative and regulatory initiatives of Congress, the Internal Revenue Service, the Department of Labor, and other regulatory agencies and the courts, to keep clients abreast of changes in the law and emerging trends.
- Assistance with plan-specific compliance and consulting support — The team also works closely with clients to help ensure their plan design and operation are best suited to their business plan and goals. On an ongoing basis, the team will work with you and your financial advisor to identify appropriate plan design options as laws change and as your business grows and develops.

## INVESTMENT EDUCATION SERVICES

Putnam also can partner with you and your financial advisor on a regular basis to assist with the monitoring of plan investments, to help with meeting your goals and objectives and those of your plan's participants, and to provide guidance on developing a strategy for creating an investment policy statement. As a first step, we have crafted a Sample Investment Policy Statement for your use.

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 29 of 31

# Abbott Laboratories Stock Retirement Plan
# DIRECT ROLLOVER REQUEST FORM    *1-800-232-7648*



This form allows you to choose a direct rollover transfer of your savings plan distribution.
The form is not valid without your signatures or an accompanying Distribution Form.

## **1** EMPLOYEE INFORMATION

_23 7| 171 97l2_
SOCIAL SECURITY NUMBER

_252 442 2394_
DAYTIME PHONE NUMBER

_C Herry_
LAST NAME

_Dennis_
FIRST NAME

_M_
M.I.

## **2** ROLLOVER OPTIONS

▶ **You must choose option 1, 2, or 3.**

**OPTION 1**

⊘ **Direct Rollover to an IRA**

If you have established an IRA and you would like your distribution issued to that IRA trustee as a **direct rollover**, please provide the information requested below. **(PLEASE NOTE:** 1. Distributions will NOT be paid to more than one institution. 2. If you request a direct rollover of Abbott stock *in certificate form*, please verify that your IRA institution will accept payment in certificates.

IRA Name: _____ CLOSED-END UNIT INVESTMENT TRUST _____

Trustee, custodian, institutions name: ___ B.A.B. INC. SEND FED EX ACCT#2455-8445-8 _____

Trustee, custodian, institutions address: ___ 10724 CARMEL COMMONS BLVD. STD 560 _____

_____ CHARLOTTE, NC 28226 _____

Account number (if available): _____

**All rollover checks and certificates will be mailed DIRECTLY to the financial institution administering the qualified plan or IRA at the address listed above. In the event the address listed above is not in good order, the rollover checks and certificates will be made payable to the financial institution listed above and mailed to your address of record.**

**OPTION 2**

○ **Direct Rollover to a Putnam Master IRA**

I must complete a Putnam Master IRA Application. Upon receipt of my application and distribution forms my account balance will be directly rolled over to the IRA. I understand that the Putnam Master IRA cannot hold shares of Abbott Common Stock. (Please review the elections made on your distribution form to ensure that you have requested to sell any Abbott Common Stock shares to be rolled over.)

**OPTION 3**

○ **Direct Rollover to Another Qualified Plan**

If a qualified retirement plan sponsored by another employer has agreed to accept a direct rollover of your distribution and you want your distribution check payable to the new trustee of that plan as a direct rollover, complete the following: This option is for cash only or Abbott Stock Shares Sold.

I hereby represent that the plan named below (1) is a qualified plan under the Internal Revenue Code and (2) has agreed to accept my direct rollover.

Name and address of employer: _____

Name and address of trustee (this *must* be provided): _____

**IF THE PLAN NAMED ABOVE HAS GIVEN YOU A WRITTEN STATEMENT THAT IT IS QUALIFIED OR THAT IT HAS AGREED TO ACCEPT YOUR DIRECT ROLLOVER, ATTACH A COPY OF THAT STATEMENT TO THIS FORM.**

## **3** PARTICIPANT SIGNATURE

X _Dennis M. Cherry_
SIGNATURE OF PARTICIPANT

_2-2-04_
DATE

| Return with Distribution Form to: | Abbott Laboratories SRP | or for Overnight Delivery | Abbott Laboratories SRP |
|---|---|---|---|
| | Putnam Investments | | Putnam Investments |
| | P. O. Box 9740 | | Investors Way |
| | Providence, RI 02940-9740 | | Norwood, MA 02062 |

CV(11)522814-008  6/11/03



**EXHIBIT**

# Confirmation Statement

STATEMENT DATE: 02/12/2004

522814
DENNIS M CHERRY
1840 SPRINGFIELD ROAD
ROCKY MOUNT NC 27801

**ABBOTT LABORATORIES**
**STOCK RETIREMENT PLAN**
ABBOTT LABORATORIES
100 ABBOTT PARK RD.
ABBOTT PARK IL 60064

CONFIRMATION NUMBER: 0405155870

THIS CONFIRMS A DISTRIBUTION FROM YOUR ACCOUNT. FOR YOUR TAX RECORDS, AN IRS
FORM 1099-R WILL BE MAILED NEXT JANUARY TO YOUR ADDRESS IN OUR RECORDS. IF
YOU HAVE ANY QUESTIONS, PLEASE CONTACT US AT THE TOLL FREE NUMBER OR WEBSITE
BELOW. IF YOU HAVE NOT DONE SO, YOU MAY STILL BE ABLE TO ROLLOVER YOUR
DISTRIBUTION TO AVOID ADDITIONAL TAXES AND PENALTIES. PLEASE CONTACT PUTNAM
INVESTMENTS AT 1-877-401-7655 FOR MORE INFORMATION.

**WE CONFIRM YOUR DISTRIBUTION AS OF 02/11/2004. UPON SETTLEMENT, PAYEE**
**DISTRIBUTION(S) WILL BE MAILED OR TRANSFERRED ON OR ABOUT 02/18/2004.**

| PAYEE INFORMATION/CHECK ADDRESS | PAYEE AMOUNT | STOCK SHARES | MARKET VALUE |
|---|---|---|---|
| B.A.B. INC CHECK<br>FBO DENNIS M CHERRY<br>10724 CARMEL COMMONS BLVD<br>STD 560<br>CHARLOTTE     NC 28226 | $137,098.26 | NA | $137,098.26 |
| **TOTAL NET DISTRIBUTION AMOUNT** | | | $137,098.26 |

**PLEASE REVIEW THIS STATEMENT AND NOTIFY PUTNAM OF ANY ERRORS OR INACCURACIES**
**WITHIN 30 DAYS OF THE DATE OF THIS STATEMENT. PUTNAM WILL NOT BE RESPONSIBLE**
**FOR ANY LOSSES YOU MAY INCUR AS A RESULT OF ANY ERRORS OR INACCURACIES THAT**
**ARE NOT BROUGHT TO OUR ATTENTION WITHIN THIS 30 DAY PERIOD.**

CONTACT PUTNAM INVESTMENTS AT:                1-800-232-7648
PLEASE VISIT US AT:                          WWW.IBENEFITCENTER.COM

Case 5:07-cv-00386-H   Document 1-2   Filed 10/05/07   Page 31 of 31

*RE3I9IF0DKP02*