IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:07-CV-386-H

RONALD ARRINGTON, ET AL.,

  Plaintiffs,

   v.

PUTNAM FIDUCIARY TRUST COMPANY,
ABBOTT LABORATORIES, INC., JOSEPH
LIONEL JONES, and BAB PRODUCTIONS,
INC.,

  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM OF LAW IN
SUPPORT OF PUTNAM FIDUCIARY
TRUST COMPANY'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**
**Fed. R. Civ. P. 56; Local Rule 7.2**

James S. Dittmar
Damian W. Wilmot
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109

Matthew W. Sawchak
N.C. State Bar No. 17059
George F. Sanderson III
N.C. State Bar No. 33054
ELLIS & WINTERS LLP
P.O. Box 33550
Raleigh, NC 27636

*Attorneys for Putnam Fiduciary Trust
Company*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 3

    A.   The Parties ...............................................................................................3

    B.   The Abbott Laboratories Stock Retirement Plan .......................................4

    C.   Putnam's Roles With Respect to the Plan...................................................4

    D.   Putnam's Procedures for Processing Distribution Requests, 2003 - 2004..................5

    E.   The Hiring, Training and Compensation of Technical Administrators ......................9

    F.   Plaintiffs' Background With Jones ...........................................................10

    G.   Plaintiffs Execute Concert Promotion Contracts With BAB Prior To Their Plan Rollovers ...........................................................................................11

    H.   Plaintiffs Directed Their Plan Account Balances Be Rolled Over to BAB ...............12

    I.   Nothing Passed Between Plaintiffs and BAB that had the Appearance of Establishing an IRA ..............................................................................13

    J.   Putnam's Conduct With Respect To Plaintiffs' Distribution Request Forms ...........14

    K.   Plaintiffs Sign Concert Promotion Contracts with BAB Following their Instructions to Putnam to Rollover Their Plan Account Balances to BAB. .............14

    L.   The Revelations of September 2004 ........................................................15

    M.   This Litigation .......................................................................................16

ARGUMENT ................................................................................................................ 16

    I.   Standard of Review....................................................................................16

    II.   Putnam Was Not A Fiduciary With Respect To The Processing Of Participant Direct IRA Rollover Requests ...........................................................17

        A.   Putnam Was Not A Fiduciary Over The Processing Of Direct IRA Rollover Requests By Agreement Or Contract.......................................20

        B.   Putnam Did Not In Practice Exercise Discretionary Authority Or Control With Respect To The Processing Of Direct IRA Rollover Requests ...............................21

III.  Even If Putnam Had Fiduciary Status With Respect To The Processing Of Direct Rollover Requests, It Would Not Have Been Obligated To Question Plaintiffs' Instructions....................................................................................................22

IV.  Even if All the Elements of a Breach of Fiduciary Duty Claim Were Present, Plaintiffs' Claims are Barred by the Statute of Limitations.................................25

    A.  Plaintiffs Had Actual Knowledge Of The Material Facts That They Claim Constitutes Breach Of Fiduciary Duty Before October 4, 2004...........................27

    B.  Plaintiffs Had Actual Knowledge Of The Consequences Of Their Decisions In September 2004 ........................................................................................................29

CONCLUSION................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Brinks's Co.*,
261 F. App'x. 583 (4th Cir. 2008) ..........................................................25

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................................................17

*Ariz. State Carpenters Pension Trust Fund v. Citibank*,
125 F.3d 715 (9th Cir. 1997) ...............................................................22

*Barrs v. Lockheed Martin Corp.*,
287 F.3d 202 (1st Cir. 2002) ...............................................................21

*Browning v. Tiger's Eye Benefits Consulting*,
313 F. App'x. 656 (4th Cir. 2009) ....................................................3, 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).............................................................................16

*Clifton D. Mayhew, Inc. v. Blake Constr. Co.*,
482 F.2d 1260 (4th Cir. 1973) .............................................................17

*Coleman v. Nationwide Life Ins. Co.*,
969 F.2d 54 (4th Cir. 1992) ..............................................................2, 18

*Cottrill v. Sparrow, Johnson & Ursillo, Inc.*,
74 F.3d 20 (1st Cir. 1996)................................................................21-22

*Custer v. Sweeney*,
89 F.3d 1156 (4th Cir. 1996) ...............................................................19

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ............................................................2, 18

*Dzinglski v. Weirton Steel Corp.*,
875 F.2d 1075 (4th Cir. 1989) .............................................................25

*FirsTier Bank, N.A. v. Zeller*,
16 F.3d 907 (8th Cir. 1994) .......................................................... passim

*Givens v. American Benefit Corp.*,
No. 92-2005, 1993 WL 165002 (4th Cir. May 17, 1993)......................19

i

*Griggs v. E. I. Dupont de Nemours & Co.*,
  237 F.3d 372 (4th Cir. 2001) ...................................................................25

*HealthSouth Rehabilitation Hosp. v. American Nat'l Red Cross*,
  101 F.3d 1005 (4th Cir. 1996) ...........................................................2, 19

*Maniace v. Commerce Bank, N.A.*,
  40 F.3d 264 (8th Cir. 1994) ...................................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................17

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) ................................................................................21

*O'Toole v. Arlington Trust Co.*,
  681 F.2d 94 (1st Cir. 1982) ....................................................................18

*Shofer v. Stuart Hack Co.*,
  970 F.2d 1316 (4th Cir. 1992) ................................................................26

*Trace v. Retirement Plan for the Salaried Employees of Merck & Co.*,
  419 F. Supp. 2d 846 (E.D. Va. 2006) ....................................................25

*Truman Bank 401(k) Profit Sharing Plan v. Levin*,
  No. 4:07CV01163, 2007 WL 3310975 (E.D. Mo. November 5, 2007) .................22

*Wilmington Shipping Co. v. New England Life Ins. Co.*,
  496 F.3d 326 (4th Cir. 2007) ..................................................................18

**STATUTES**

29 U.S.C. § 207(a)(1)...................................................................................10

29 U.S.C. § 213(a)(1).......................................................................... passim

29 U.S.C. §§ 1001-1461 ................................................................................1

29 U.S.C. § 1002(21)(A)...............................................................................17

29 U.S.C. § 1113(2) .....................................................................................25

**OTHER AUTHORITIES**

29 C.F.R. § 2509.75-8 at D-2 ............................................................................................. 19-20

Fed. R. Civ. P. 56(c) .......................................................................................................16

Fed. R. Civ. P. 56(e)(2)...................................................................................................16

Defendant Putnam Fiduciary Trust Company ("Putnam") respectfully submits this memorandum of law in support of its motion for summary judgment.

## INTRODUCTION

Plaintiffs' claim against Putnam for breach of fiduciary duty under the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. §§ 1001-1461, fails for three independent reasons. First, Putnam did not owe a fiduciary duty to plaintiffs related to the processing of their individual retirement account ("IRA") rollover distributions. Second, even if there were a fiduciary duty, Putnam committed no breach. Third, because plaintiffs knew, more than three years before they filed their action, that Putnam had processed their rollover requests and that a con artist had stolen their money their claim is barred by ERISA's three-year statute of limitations.

Plaintiffs are former employees of Abbott Laboratories, Inc. ("Abbott") and former participants in Abbott's 401(k) plan. From 2003 to mid-2004 they fell victim to a con artist who worked as a financial adviser in the Rocky Mount, North Carolina community and who is now in prison.

Exercising their rights as former employees under the Abbott 401(k) plan, plaintiffs requested Putnam, the plan's trustee and administrative record-keeper, to distribute the assets in their individual plan accounts to BAB, Inc. ("BAB"), whom they identified as their IRA rollover trustee or custodian. Plaintiffs made these requests by submitting written and signed distribution forms to Putnam. Consistent with its obligation under plan documents to follow participant instructions and with established procedures and practices for non-discretionary processing of participant distribution requests, Putnam processed plaintiffs' requests as directed.

BAB, however, turned out to be under the control of the con artist who stole plaintiffs' money. To recoup their losses, plaintiffs have sued the con artist and BAB, plus Abbott and

Putnam.  Plaintiffs claim that Putnam breached an alleged fiduciary duty under ERISA by processing distributions exactly as requested by plaintiffs in their written and signed forms.

In the absence of any genuine issue of material fact, Putnam is entitled to summary judgment as a matter of law for three independent reasons.

First, Putnam did not have fiduciary authority with respect to the processing of participants' direct IRA rollover requests.  Under ERISA, discretionary authority is the hallmark of fiduciary status, *see Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 61 (4th Cir. 1992) (discretionary authority "pivotal" to definition of fiduciary under ERISA), and an ERISA fiduciary has such status with respect to any function only to the extent to which it exercises discretionary authority.  *See DiFelice v. U.S. Airways, Inc.,* 497 F.3d 410, 418 (4th Cir. 2007) (a person is a fiduciary "only to the extent" that he exercises discretionary authority or control over the function in question).  Yet Putnam had no discretionary authority under plan documents over the processing of plaintiffs' direct rollover distribution requests.  And, consistent with established procedures and practice, it exercised no discretionary authority in actually performing that function.  Putnam's role was, quite simply, to do what plaintiffs requested. Under these circumstances, Putnam cannot be liable for breach of fiduciary duty as claimed by plaintiffs.  *See HealthSouth Rehabilitation Hosp. v. American Nat'l Red Cross,* 101 F.3d 1005, 1009 (4th Cir. 1996) (finding that a party with a limited role processing claims under a ERISA plan clearly was not a fiduciary), *cert. denied,* 520 U.S. 1264 (1997).

Second, even if Putnam were a fiduciary with respect to the processing of plaintiffs' direct IRA rollover distribution requests, which it was not, Putnam cannot be liable for breach of fiduciary duty where it simply followed written requests signed by plan participants to process transactions which the plan permitted.  For example, in remarkably analogous circumstances, a

plan trustee was held by the Eighth Circuit not to have violated any ERISA fiduciary duty by processing participant loan requests without inquiry, not withstanding the fact that inquiry by the trustee would have shown that the participants intended to loan the proceeds to a plan sponsor which was in dire financial straits and ultimately went bankrupt, resulting in the loss of the participants' money. *See FirsTier Bank, N.A. v. Zeller,* 16 F.3d 907, 912 (8th Cir. 1994) ("when acting at the direction of the ultimate beneficiary of a trust, the trustee's fiduciary duty is satisfied if it simply complies with a direction that does not violate the terms of the trust.").

Third, plaintiffs' claims are barred by ERISA's three-year statute of limitations. For one thing, plaintiffs knew more than three years before filing suit what Putnam's actions and conduct had been in processing the IRA rollover distributions that plaintiffs themselves had requested. Additionally, plaintiffs knew, more than three years before suit, through word-of-mouth in the Rocky Mount community, local press coverage, official public notices, and law enforcement actions that they had lost the proceeds of their IRA rollover distributions. Accordingly, plaintiffs had actual knowledge of Putnam's alleged breach more than three years before filing suit and their action is time barred. *See Browning v. Tiger's Eye Benefits Consulting,* 313 F. App'x. 656, 661-662 (4th Cir. 2009).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Parties

Plaintiffs are thirty-one former employees of Abbott's manufacturing facility in Rocky Mount and former participants in the Abbott Laboratories Stock Retirement Plan (the "Plan"). Putnam's Appendix ("PAPP"), Tab 1, ¶ 1. Abbott sponsored the Plan, and its Senior Vice President of Human Resources was the Plan Administrator. PAPP, Tab 3, ¶ 15.2. Putnam was the Plan's trustee and administrative service provider, or record keeper. PAPP, Tab 4; Tab 5, § I.

**B.     The Abbott Laboratories Stock Retirement Plan**

The Plan is a 401(k) plan, established by Abbott in 1996.  PAPP, Tab 3.  The Plan is a "defined contribution" or "individual account" employee benefit plan that provides each participant with an individual account and pays benefits to each participant based solely on the balance in his or her individual account.  *Id., ¶* 1.1.  The Plan Document specifies that the Plan is a "participant-directed plan," under which participants retain and exercise control over the assets in their individual accounts.  *Id., ¶¶* 5.1-5.5, 5.7.  Plan participants had the opportunity to choose from a broad range of investment alternatives for their Plan contributions.  *Id.*  Participants also had the right to direct transactions in their account assets, including withdrawals, transfers, rollovers, and loans.  *Id.*

**C.     Putnam's Roles With Respect to the Plan**

Putnam acted in two capacities with respect to the Plan:  (1) trustee pursuant to the Trust Agreement, and (2) administrative service provider pursuant to the Service Agreement.

**1.     The Trust Agreement**

Abbott, Putnam and three co-trustees executed the Trust Agreement in 1995.  PAPP, Tab 4.  Under the Trust Agreement, Putnam is required to invest the Trust assets pursuant to the directions of the co-trustees or an investment manager, and to make payments from the Plan pursuant to the directions of the Plan Administrator.  *Id., ¶* 4.  The Trust Agreement is silent on the subject of processing participants' distribution requests.

**2.     The Service Agreement**

Putnam and Abbott executed the Service Agreement in 1996.  PAPP, Tab 5.  The Service Agreement enumerates specific administrative service functions Putnam will perform and the fees it will receive for those functions, and it identifies Putnam's specific responsibilities with respect to those functions, including its responsibilities for processing transactions such as

distributions out of participant accounts.  *Id.*  Pursuant to the Service Agreement, Abbott paid Putnam a base recordkeeping fee of $16 per participant per year, plus an additional amount based on the plan's year-end assets.  *Id.,* § III(A)(1).

The Service Agreement specifically provides that Putnam shall process participant-directed distributions of assets in individual participant accounts.  *Id.,* § II(D)(7).  The Service Agreement does not grant Putnam discretionary authority or control with respect to the processing of these requests.  Instead, the Service Agreement provides that "[w]hen Putnam receives properly completed distribution forms from the Participant, it will distribute the benefit according to the Participant's directions."  *Id.*  The Service Agreement further provides that Putnam will receive a $10 fee for each distribution it processes.  *Id.,* § III(B)(2).  Except in limited circumstances not relevant here, Putnam "has no obligation to monitor, control or in any way exercise powers or discretion in handling or disposing of Plan assets, including the disposition of any funds, securities or other assets under the Plan."  *Id.*, § IV(E)(1).

**D.  Putnam's Procedures for Processing Distribution Requests, 2003 - 2004**

Putnam established procedures to process participant distribution requests.  During the period 2003 to 2004, these procedures were set forth in a manual entitled "the Abbott Laboratories Stock Retirement Plan – DCPA Operations Team Procedures Manual and the Abbott Laboratories SRP Operations Guide" ("Operations Manual").

Whenever a participant retired from Abbott or otherwise terminated employment with the company, Abbott notified Putnam through a data feed of the participant's eligibility for a distribution from the Plan.  PAPP, Tab 6, p. PFTC000315.  This data feed triggered Putnam to mail the participant a "Distribution Kit" containing information describing the four distribution options a participant could choose among and the potential tax consequences of those options, as well as the forms necessary to request any of the four distribution options.  *Id.; see also* PAPP,

5

Tabs 7-13. Retired or terminated participants could elect to (i) postpone the distribution and keep their entire account balance invested in the Plan, (ii) distribute their entire account balance to themselves, (iii) rollover the entire account balance to an IRA or to a new employer's 401(k) plan, or (iv) rollover a portion of the account balance and distribute the remainder to themselves. PAPP, Tabs 8-11. The Distribution Kit instructed participants to mail their completed and executed forms to Putnam. PAPP, Tab 7.

When Putnam received the forms, they were fed into an automated system that scanned them into an electronic imaging system. PAPP, Tab 6, at PFTC000315. The imaging system then routed the scanned forms to a viewing system that allowed Technical Administrators and Plan Service Associates (collectively referred to "Technical Administrators") to review and process them. *Id.* Technical Administrators' processing of the distribution request forms involved the following: (i) confirming that the distribution request form was in "good order," and (ii) entering the information contained on the form into Putnam's recordkeeping system (PRIDE) so that the participant's Plan account balance could be distributed as the participant had requested. *Id.,* at PFTC000315 – PFTC000316.

When confirming whether a participant's distribution request form was in "good order," the Operation Manual states in relevant part that a Technical Administrator must be able to answer the following questions in the affirmative:

- Is the form filled [out] completely, with no confusion as to what participant is requesting[?]
- If a direct rollover is requested, is the direct rollover form also attached[?]
- Is the form signed[?]

    . . . ANY & ALL MISSING, QUESTIONABLE, UNCLEAR,
    INFORMATION ON ANY PART OF THE FORM MUST BE
    FORWARDED VIA IMAGE TO PARTICIPANT SERVICES
    FOR CALLOUT. . . .

*Id.*, at PFTC000315.  In line with this written policy, Putnam trained and supervised its Technical Administrators that, when reviewing participants' distribution request forms for "good order," they must determine whether the participants had signed the forms, had indicated clearly which of the four distribution options they wanted, and, if the participant elected to make either a 100% direct IRA rollover distribution or a split distribution, had provided a legible name and address of the entity to which the distribution should be made.  PAPP, Tab 14, at 119:11-120:6; Tab 15, at 54:5-15; Tab 16, at 37:17-38:12.  The processing of distribution requests did not entail the exercise of any discretion or independent judgment by the Technical Administrators who processed them.  PAPP, Tab 15, at 54:3-9.  If the distribution request forms were in "good order," as Putnam intended the terminology to mean, Technical Administrators processed them. PAPP, Tab 5, at PFTC000315; Tab 14, at 119:3-7; Tab 15, at 54:3-9; Tab 16, at 38:8-12.

"Missing information" in the Opinion Manual meant that the participant failed to sign his distribution request forms.  PAPP, Tab 15, at 56:18 – 56:20.  "Questionable information" in the Opinion Manual meant that the Technical Administrator could not discern how the participant wanted his Plan assets distributed because the participant's writing was illegible.  *Id.* at 57:2 – 57:7.  If a participant had after-tax money in his Plan account but failed to elect on his distribution forms how he wanted it distributed, such a situation would fall within the definition of "unclear information" in the Opinion Manual.  *Id.* at 57:9 – 57:15.  Pursuant to Putnam's written policy, Technical Administrators forwarded distribution request forms with "missing, questionable, or unclear information" to Putnam's call center, which would contact the participant to obtaining the necessary information.  *Id.* at 57:22 – 57:24, 57:7, 57:15 – 57:16; *see also* PAPP, Tab 6, at PFTC000315.

Plaintiffs identify three "red flags" but none was something that Technical

Administrators were required to look for. First, the fact that a participant named an institution without a designation such as "trust company," "bank," or "fiduciary" on the line of the Direct Rollover Request Form that reads "Trustee, custodian, institutions name," would not have made the Direct Rollover Request Form out of good order. Technical Administrators' job functions did not include investigating the identity of the entity named in the distribution form. Instead, they were responsible for looking for a name that was legible and had a proper mailing address. PAPP, Tab 14, at 100:13-15, 120:7-10; Tab 15, at 75:15-18; Tab 16, at 25:10-26:15.

Putnam also did not require participants to include an account number on the Direct Rollover Request Form because, in many instances, an account number was not yet available at the time the request was submitted. PAPP, Tab 14, at 142:7-13; Tab 15, at 79:22-80:11; Tab 16, at 24:14-20. The Direct Rollover Request Form states that a participant should provide an account number for his or her new IRA only if one were available. PAPP, Tab 12. If a participant did not include an account number for the new IRA on his or her Direct Rollover Request Form, the distribution check had the participant's Social Security Number printed on it. PAPP, Tab 15, at 80:4-11; Tab 16, at 24:19-20.

Finally, the fact that a participant provided a name on the "IRA Name" line of the Direct Rollover Request Form that did not include the participant's own name would not have caused the request to be out of good order. Putnam did not require that Direct Rollover Request Forms include a name, let alone a name that includes the participant's name. PAPP, Tab 6, at PFTC000323. Moreover, Putnam made out the distribution check to the entity identified on the distribution request forms "FBO [participant's name]." PAPP, Tab 15, at 77:7-9; Tabs 49-61.

After a Technical Administrator confirmed that the distribution forms were in "good order" and entered the information contained on the forms into the PRIDE system, another

Technical Administrator checked the data entered in the PRIDE system against the information contained on the executed distribution request forms for correctness. PAPP, Tab 14, at 62:7-24; Tab 15, at 63:9-18; Tab 16, at 27:24-28:21. Following this quality control process, the Technical Administrator who performed the quality check confirmed in the PRIDE system that the data processing of the distribution request forms was complete. PAPP, Tab 14, at 57:16 – 58:9.

If a participant elected to have 100% of his Plan account rolled over to an IRA or a new employer's 401(k) plan, Putnam liquidated the account holdings, segregated the assets to a distribution account, and generated and mailed a check to the entity for the benefit of the participant at the address indicated on the participant's Direct Rollover Request Form. PAPP, Tab 2, ¶ 6. Putnam also sent each participant a confirmation statement showing to whom it had sent the distribution check and requesting that the participant notify Putnam within 30 days of receipt of the confirmation if the distribution was erroneous. *See, e.g.,* PAPP, Tabs 62-81.

Putnam did not consider the propriety or prudence of participants' distribution directions or delay the processing of directed transactions in order to do so. Also, both Putnam and Abbott knew that Putnam had no such role. PAPP, Tab 15, at 40:8-13, 41:14-17; Tab 82, at 2, 8, 27 (guide provided to Abbott by Putnam to illustrate "day-to-day administration" of the Plan, showing Putnam's limited role with respect to processing of distribution requests).

### E. The Hiring, Training and Compensation of Technical Administrators

The job of Technical Administrator did not entail the exercise of discretion or independent judgment. PAPP, Tab 15, at 6-7; Tab 16, at 7. Accordingly, the personnel who processed distribution request forms had the qualifications and training consistent with performing administrative and clerical tasks.

Indeed, to perform their functions, Technical Administrators did not require any particular regulatory registration or professional licensure. *See* Dep. Exs. 2-4 to Tab 14. In

addition, they were not required to have graduated from college. PAPP, Tab 15, at 6-7; Tab 16, at 7.

Putnam trained Technical Administrators not to question participant's directions to make Plan distributions, as the Plan is a participant-directed plan and such transactions are permitted under the Plan. PAPP, Tab 15, at 39:10-12, 40:12-13, 41:14-17; Tab 16, at 25-26, 36. They were trained to review participants' distribution request forms only for "good order" as described above. PAPP, Tab 14, at 142-143; Tab 15, at 39, 41.

Putnam also paid Technical Administrators commensurate with a clerical, data entry position. PAPP, Tab 155, ¶ 4. Because they did not perform work that included the exercise of discretion and independent judgment and, thus, could not qualify for the administrative exemption under the statute, Putnam also paid Technical Administrators as non-exempt employees under the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1).[1] PAPP, Tab 155, ¶ 5.

### F. Plaintiffs' Background With Jones

Fifteen of the thirty-one plaintiffs met Joseph Jones while they were still employed by Abbott and years before they submitted the distribution request forms to Putnam. PAPP, Tab 156. Jones held himself out as a licensed investment advisor and maintained an office in Rocky Mount, North Carolina. PAPP, Tab 20, at 56-58. These fifteen plaintiffs became familiar with Jones through word-of-mouth and social settings, such as church or school, or from other Abbott non-managerial employees.[2] PAPP, Tab 191. At different times between January 1998 and 2003, these fifteen plaintiffs worked with Jones to make a number of investments. PAPP, Tab

---

[1]    An employee may qualify for the administrative exemption under the Fair Labor Standards Act and thus not entitled to overtime wages if, among other things, his or her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *See* 29 C.F.R. § 541.2.

[2]    The remaining plaintiffs learned of Jones the same way. PAPP, Tab 191.

156.  Most plaintiffs performed no diligence to determine whether Jones was a licensed or qualified investment advisor.[3]  PAPP, Tab 192.

### G.    Plaintiffs Execute Concert Promotion Contracts With BAB Prior To Their Plan Rollovers

Each of the fifteen plaintiffs who had prior dealings with Jones made investments in a company identified by Jones as BAB, a concert production company located in Charlotte.  PAPP, Tab 156.  Jones told plaintiffs that their money went toward co-producing concerts with BAB and that they, in return, would receive a percentage of the concert proceeds.  PAPP, Tab 193.  To establish the investment, each of the fifteen plaintiffs signed one or more contracts that were also ostensibly signed by BAB's president.  PAPP, Tabs 83-94, 156.  The contracts state that "the parties hereto desire to co-produce the production services for several concerts," and that the money paid to BAB pursuant to the contract was "a deposit for use in co-production [of] said concerts to cover advance cost."  PAPP, Tabs 83-94.  Before investing money in and signing contracts with BAB, most of the plaintiffs did not perform any diligence to determine if BAB was a legitimate business or a sound financial investment.[4]  PAPP, Tab 194.

---

[3]    Curtis Barnes testified that he searched for Joe Jones on the internet at some point.  PAPP, Tab 20, at 63:5-15.  Rita Harris testified that she had called the Secretary of State's office in 2001 and was told that Jones was a licensed investment adviser.  PAPP, Tab 32, at 62:14-25.

[4]    At best, Deborah Gaines testified that she called the Better Business Bureau to see if BAB was a real company.  PAPP, Tab 30, at 41:23-42:8.

**H.**     **Plaintiffs Directed Their Plan Account Balances Be Rolled Over to BAB**

All but two plaintiffs left Abbott, whether by retirement or otherwise, between late 2003 and mid-2004.[5] PAPP, Tab 195. Faced with the decision of what to do with their Plan account balances, plaintiffs sought advice from Jones. PAPP, Tab 196. When some of plaintiffs met with Jones to discuss their options, they brought with them their Distribution Kit forms. PAPP, Tab 197. When others met with Jones, he had blank copies of the 100% Direct Rollover Distribution Form and the Direct Rollover Request Form. *Id.*

Jones advised plaintiffs to execute the 100% Direct Rollover Distribution Form and the Direct Rollover Request Form so that their Plan account balances could be rolled over to BAB. PAPP, Tab 198. He told plaintiffs that their rolled over Plan assets would be used to co-produce concerts with BAB and that they, in return, would receive fixed, monthly payments from BAB for an indefinite period of time. *Id.* Plaintiffs did not conduct any diligence to determine if BAB could properly receive a direct IRA rollover distribution. PAPP, Tab 199. Plaintiffs decided to rollover their Plan account balance to BAB based solely upon the advice of Jones. *Id.*

Jones filled out the 100% Direct Rollover Distribution Form and the Direct Rollover Request Form for each plaintiff. PAPP, Tab 200. Most of plaintiffs witnessed Jones prepare these forms. *Id.* Most of plaintiffs then signed the forms immediately. PAPP, Tabs 157, 200. Some of plaintiffs signed blank 100% Direct Rollover Distribution Forms and Direct Rollover Request Forms, and Jones told them that he would prepare the forms to name BAB as the entity to receive the rollover distributions. PAPP, Tabs 157, 200.

On the "IRA Name" line of the 31 plaintiffs' Direct Rollover Request Forms, two name

---

[5]     Plaintiff Rita Harris retired from Abbott in 2002, but left the Plan in the fall of 2003. PAPP, Tab 32, at 12, 79-80. Plaintiff Joyce Robinson Houston left Abbott in 2001, but did not leave the Plan until the summer of 2003. PAPP, Tab 43, at 9, 50, 53.

"Closed-End Limited Partnership," one names "Closed-End Partnership," four name "BAB Closed-End Partnership," one names "BAB Closed-End Limited Partnership," one names "BAB Unit Investment Trust," and twenty-three name "Closed-End Unit Investment Trust." PAPP, Tabs 95-125. Plaintiffs' Direct Rollover Request Forms name either "BAB Inc." or "B.A.B. Inc." on the "Trustee, custodian, institutions name" line of the form. *Id.* Twelve of the 31 Direct Rollover Request Forms show an account number on the line that reads "Account number (if available)"; the rest of the forms have no account number. *Id.* All of the forms provide a legible U.S. mailing address. *Id.*

Either Jones or plaintiffs mailed the completed and signed 100% Direct Rollover Distribution Request Forms and Direct Rollover Request Forms to Putnam. Twenty of the 31 plaintiffs received a written confirmation statement from Putnam stating that it had distributed the balance of the participants' Plan accounts (specifying the dollar amount) to BAB and requesting that the plaintiff notify Putnam within 30 days of receipt of the confirmation if the distribution was erroneous.[6] PAPP, Tabs 62-81, 157. Thirteen plaintiffs received a copy of the distribution check stub stating that Putnam had distributed the balance of their Plan accounts to BAB. PAPP, Tabs 49-61, 157. None of the plaintiffs who received the written confirmation statement or a copy of the distribution check stub contacted Putnam to question or express any concern about the distribution of their Plan account funds to BAB. PAPP, Tab 157.

## I. Nothing Passed Between Plaintiffs and BAB that had the Appearance of Establishing an IRA

None of plaintiffs ever received from any source any literature concerning any IRA

---

[6]  Putnam, in accordance with its policies and practices in 2003-2004, sent written confirmations to each and every plaintiff in this case. Ten plaintiffs, however, testified during their depositions that they have no recollection of receiving such a confirmation. Putnam does not – and need not – dispute their testimony on this point in this motion.

business at BAB, any application to establish an IRA account at BAB, any written confirmation from BAB that an IRA account for their benefit had been established at BAB, or any account statement for an IRA account for their benefit at BAB.  PAPP, Tab 156.

**J.     Putnam's Conduct With Respect To Plaintiffs' Distribution Request Forms**

Technical Administrators processed plaintiffs' written and executed 100% Direct Rollover Distribution Forms and Direct Rollover Request Forms and distributed the balances of plaintiffs' Plan accounts to BAB in accordance with the terms of the requests.  PAPP, Tab 156; *compare* PAPP, Tabs 49-81 *with* PAPP, Tabs 95-125.  This process included the quality control process described above.  There is no evidence that any of the Technical Administrators who reviewed plaintiffs' direct IRA distribution forms hesitated in processing them, found them to contain "missing, questionable, [or] unclear information," or concluded that they were not in good order.

**K.     Plaintiffs Sign Concert Promotion Contracts with BAB Following their Instructions to Putnam to Rollover Their Plan Account Balances to BAB**

After Putnam processed plaintiffs' distribution and direct IRA rollover request forms and distributed their account funds to BAB at the address provided on the signed Direct Rollover Request Forms, all but five plaintiffs executed contracts with BAB providing for them to finance the co-production of concerts.  PAPP, Tab 156.  Of these twenty-six plaintiffs, fifteen of them had executed co-production contracts with BAB prior to submitting distribution request forms to Putnam.  PAPP, Tabs 83-95, 156.  As with the pre-distribution contracts, these post-distribution contracts state that "the parties hereto desire to co-produce the production services for several concerts," and that the money paid to BAB pursuant to the contracts was "a deposit for use in co-production [of] said concerts to cover advance cost."  PAPP, Tab 127-152.  Plaintiffs believed that these contracts were financed by the funds they had instructed Putnam to distribute to BAB.

PAPP, Tab 157.

## L.     The Revelations of September 2004

Following the distribution of their account balances, most plaintiffs began receiving monthly payments that Jones claimed to be returns on their investments in BAB.  PAPP, Tabs 160-190.  The monthly payments, however, ended for all plaintiffs by mid-September 2004.  *Id.*  On or within a few days of September 13, 2004, many plaintiffs learned that the North Carolina Secretary of State had issued a summary cease and desist order against Jones and "shut down" his business for engaging in fraudulent activity.  PAPP, Tab 158.  After hearing news of Jones' activities, on or within a few days of September 13, 2004, most of plaintiffs gathered at Jones' office and demanded to know what had happened to their money and its return.  PAPP, Tab 201.  Jones told some plaintiffs that BAB had stolen the money.  PAPP, Tab 202  He also promised some plaintiffs that he would somehow recover their stolen money.  *Id.*  Most plaintiffs did not believe Jones' claim that he was not involved in the scheme, but all, in any event, believed their money had been stolen.  PAPP, Tab 158.

By the end of September, 2004, all of plaintiffs learned that (i) authorities had arrested Jones and raided his office; (ii) Jones had lost his registration to sell investments in January 2003; (iii) authorities believed Jones had operated a Ponzi Scheme and had stolen the money his clients had instructed Putnam to rollover to BAB; and (iv) authorities believed BAB was a sham.  PAPP, Tab 158.  Plaintiffs learned this information from other Abbott retirees and employees and local news media, such as the televised Channel 5 News and the printed Rocky Mount Telegram.  PAPP, Tab 158.  In fact, most of the plaintiffs read the September 22, 2004 publication of the Rocky Mount Telegram, which reported that "[Jones] has been ordered to stop selling investments after state officials accused him of bilking numerous clients out of large sums of money for the past 20 months," on or about the day it was published.  PAPP, Tab 153.

Between September 20 and September 24, 2004, some plaintiffs sent Jones written demands seeking the return of their money. PAPP, Tab 158. Others – also in September 2004 – sought the assistance of the Secretary of State's Office and Congressman Butterfield to get their money back. PAPP, Tab 158. The Rocky Mount Telegram reprinted the North Carolina Secretary of State's cease and desist order against Jones on October 3 and 4, 2004. PAPP, Tabs 154-155.

### M. This Litigation

Plaintiffs, except for Curtis Barnes, commenced this action on October 5, 2007. *See* Docket Entry No. 1. Barnes filed his claim on March 13, 2009. *See* Docket Entry No. 58.

## ARGUMENT

### I. Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-25 (1986). Once the moving party has identified the portions of the record that it believes demonstrate the absence of a genuine issue of fact, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

The Supreme Court has held that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Where the non-moving party bears the burden of proving an issue at trial, however, that party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Id.* at 324 (quotations and citations omitted). It is not sufficient for the nonmovant to argue "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Nor can the nonmovant raise "[f]actual disputes that are irrelevant or unnecessary." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Plaintiffs cannot establish that there is a genuine issue for trial on two independent essential elements of their breach of ERISA fiduciary duty claim – namely, Putnam's fiduciary status with respect to the activity at issue and Putnam's duty, even if a fiduciary, to disregard clear participant directions. Accordingly, summary judgment in Putnam's favor is warranted.

As for Putnam's affirmative limitations defense, Putnam bears the burden of establishing that plaintiffs knew of Putnam's alleged breach of fiduciary duty more than the statutory period before they filed their action. *See Clifton D. Mayhew, Inc. v. Blake Constr. Co.,* 482 F.2d 1260, 1262 (4th Cir. 1973). Putnam meets this burden and, therefore, summary judgment is also warranted on this third independent ground.

## II.     Putnam Was Not A Fiduciary With Respect To The Processing Of Participant Direct IRA Rollover Requests

Plaintiffs' claim of breach of fiduciary duty fails because Putnam did not possess fiduciary status with respect to the processing of participant directed IRA rollover requests.

Under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), a person is a fiduciary:

> [t]o the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Under clause (i) of the statute – the only provision of § 3(21)(A) relevant to this case – although a person may be a fiduciary with respect to other functions, that person has fiduciary responsibility for plan management or assets only to the extent that he exercises discretionary authority or control over the management or disposition of the plan assets. *DiFelice,* 497 F.3d at 418. "In the absence of these activities, it would be unfair to impose on [a person] the responsibilities and liabilities created by the statute for fiduciaries." *O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 96 (1st Cir. 1982) (holding that a bank's responsibilities as the depository for pension funds did not make it a plan fiduciary).

Fiduciary status is also not "an all-or-nothing" proposition. *Coleman,* 969 F.2d at 61. Fiduciary status exists "only as to the activities which bring the person within the definition." *Id.*; *DiFelice,* 497 F.3d at 418 ("ERISA fiduciaries owe [duties of prudence and loyalty] only when they are acting in their capacity as fiduciary."); *Wilmington Shipping Co. v. New England Life Ins. Co.,* 496 F.3d 326, 343 (4th Cir. 2007) (explaining that ERISA's definition of fiduciary "is couched in terms of functional control and authority of the plan" and that "a person may be an ERISA fiduciary for some purposes and not for others."). As this Court recognized in its Order on defendants' motions to dismiss, a court must "focus on the function performed by a party in determining whether the party has exercised the requisite discretion and 'owes fiduciaries duties with regard to particular conduct.'" Order Denying Motions to Dismiss, at 12 (Sept. 26, 2008) (quoting *DiFelice,* 497 F.3d at 418). To make this determination, the court should look at the plan documents for a "formal allocation" of fiduciary responsibilities over the function at issue as well as the party's actions to see if it in fact exercised the requisite discretionary authority over the function. *See Coleman,* 969 F.2d at 61. In this case, as this Court previously has recognized, the relevant function is Putnam's processing of participant-

directed IRA rollover requests. *See* Order Denying Motions to Dismiss, at pp. 12-13. The question presented therefore is whether, by formal allocation or actual conduct, Putnam exercised discretionary authority or control over the management or disposition of Plan assets in the processing of participant requested IRA rollover distributions.

Important to this Court's analysis is the Fourth Circuit's instruction that ministerial functions are not fiduciary functions. *See, e.g., Custer v. Sweeney,* 89 F.3d 1156, 1162 (4th Cir. 1996); *see also Givens v. American Benefit Corp.,* No. 92-2005, 1993 WL 165002, at *3 (4th Cir. May 17, 1993) (citing circuit authority for proposition that "ministerial tasks, such as applying plan rules and processing claims" are not fiduciary functions) (a copy of this decision is attached hereto as Exhibit A); *HealthSouth Rehabilitation Hosp.,* 101 F.3d at 1009 (finding that a party with a limited role processing claims under a plan and "reading a computer screen to determine who is and is not covered" was not a fiduciary under the ERISA plan); *see also* 29 C.F.R. § 2509.75-8 at D-2.

The Department of Labor ("DOL"), the federal agency responsible for interpreting and enforcing the fiduciary provisions of ERISA, issued Interpretive Bulletins Relating to ERISA, 29 C.F.R. § 2509.75-8 at D-2, which provide additional guidance on which activities constitute ministerial functions and why. Specifically, the DOL advised that:

> a person who performs purely ministerial functions . . . for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons *is not a fiduciary* because such person does not have discretionary authority or discretionary control respecting management of the plan [and] does not exercise any authority or control respecting management or disposition of the assets of the plan . . . .

(Emphasis added).  Such ministerial functions include collection and application of contributions, processing of plan claims, maintenance of service and employment records, calculation of benefits and making recommendations for decisions as to plan administration.  *Id.*

Here, the Plan documents and Putnam's established procedures for processing direct IRA rollover distributions demonstrate that Putnam did not have or exercise relevant discretionary authority.  Accordingly, Putnam did not have relevant fiduciary status and plaintiffs' claim fails as a matter of law.

### A.     Putnam Was Not A Fiduciary Over The Processing Of Direct IRA Rollover Requests By Agreement Or Contract

There is no provision in the Trust Agreement or Service Agreement that confers fiduciary responsibility on Putnam with respect to processing distribution requests.  Both the Trust and Service Agreements expressly state that Putnam does not have any discretion with respect to investing or disposing of Plan assets.  PAPP, Tab 4, ¶ 6; Tab 5, §§ II(D)(7), IV(E)(1).  Moreover, neither document explicitly or implicitly assigns Putnam fiduciary responsibility for such transactions.  The Trust Agreement is silent with respect to the processing of distribution requests.  The Service Agreement, however, clearly describes such transactions as ministerial: "When Putnam receives properly completed distribution forms from the Participant, it will distribute the benefit according to the Participant's directions."  PAPP, Tab 5, § II(D)(7).  The Service Agreement also provides that Putnam should receive a processing fee of only $10 per distribution, a level of compensation commensurate with clerical transaction processing and not indicative of compensation for the training, oversight and legal risks of fiduciary decision-making.[7]  *Id.,* § III(B)(2).

_____

[7]     There are sound policy reasons for why the processing of distribution requests is treated as ministerial, including the fact that a discretionary role would expose the service provider to risk of liability.  To impose a duty of prudent inquiry into the processing of each 401(k) plan distribution

### B. Putnam Did Not In Practice Exercise Discretionary Authority Or Control With Respect To The Processing Of Direct IRA Rollover Requests

The record also shows that Putnam's processing of the direct IRA rollover distribution requests did not involve any exercise of discretion or control sufficient to elevate the task it performed above a purely ministerial function. PAPP, Tab 15, at 54:3-9. Because their job did not entail such functions, the position of Technical Administrator did not require any specialized training or licensure, and the people hired to perform this function were compensated commensurate with a clerical position and were classified as non-exempt, namely clerical, personnel. PAPP, Tab 15, at 6-7; Tab 16, at 7; Tab 155, ¶¶ 4-5.

In practice, Putnam did nothing more than receive plaintiffs' distribution requests, review them pursuant to policy and procedures reviewed by Abbott, determine whether there was sufficient information to process the request, and then distribute assets in accordance with the terms of the requests. *Compare* PAPP, Tabs 62-81 *with* Tabs 95-125; *see supra* Section D of Statement of Undisputed Material Facts. In this process, Putnam did not exercise any discretion or control over plaintiffs' account assets. *See supra* Section D of Statement of Undisputed Material Facts.

Such limited conduct as was performed by Putnam cannot rise to the level of fiduciary function. *See Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996) (where counterclaim defendant merely "collect[ed] and disburs[ed] money due, [he] was simply a

---

request made by plan participants would translate into increased costs of doing business, which undoubtedly would be passed on to plans and participants through increased fees. This would not be sound policy. "In general, increased burdens necessarily increase costs, discourage employers from offering plans, and reduce benefits to employees." *Barrs v. Lockheed Martin Corp.*, 287 F.3d 202, 208 (1st Cir. 2002) (rejecting plaintiff's argument that the plan administrator must communicate information particular to each plan participant because a requirement of individualized advice would impose "enormous burdens" on plan administrators) (citing *Varity v. Howe*, 516 U.S. 489, 497 (1996); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262-63 (1993)).

conduit, performing a ministerial act directed by [counterclaim plaintiff]"); *see also Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 721-22 (9th Cir. 1997) (holding that an entity that performs ministerial or administrative duties "within a framework of policies, rules, and procedures established by others is not an ERISA fiduciary" and that "mak[ing] a decision in the exercise of a ministerial duty does not rise to the level of discretion required to be an ERISA fiduciary"); *Truman Bank 401(k) Profit Sharing Plan v. Levin*, No. 4:07CV01163, 2007 WL 3310975, at *6 (E.D. Mo. November 5, 2007) (holding that defendant trustees were not fiduciaries when they made distributions in accordance with instructions from the plan administrator) (a copy of this decision is attached hereto as <u>Exhibit B</u>).

### III. Even If Putnam Had Fiduciary Status With Respect To The Processing Of Direct Rollover Requests, It Would Not Have Been Obligated To Question Plaintiffs' Instructions

Even if Putnam had fiduciary status with respect to the processing of direct IRA rollover distribution requests, it still would not have had a duty to look behind plaintiffs' instructions to process a transaction which is explicitly permitted under the Plan Document or to question the prudence of plaintiffs' decisions to request distributions. Indeed, the argument that a trustee, when presented with purported "red flags," has a duty to investigate a participant's directions and question the prudence of his decision was squarely rejected by the Eighth Circuit in a remarkably parallel case, *FirsTier Bank, N.A. v. Zeller,* 16 F.3d 907 (8th Cir. 1994).

In *FirsTier,* the sponsor of a profit sharing plan was experiencing grave financial difficulties and was indebted to FirsTier Bank, both the trustee of the sponsor's profit sharing plan and its commercial lender. *Id.* at 910. In an attempt to pay off the sponsor's debt to FirsTier and save the company, the president of the company had the sponsor's board of directors resolve to substitute the president for FirsTier as trustee of the Plan. *Id.* The president intended to free up cash by funding the existing plan accounts with annuities. *Id.* FirsTier,

however, refused to accept its removal as plan trustee because it knew of the sponsor's serious indebtedness and feared misuse of plan assets. *Id.*

Days later, the sponsor's president convinced a number of plan participants to borrow from their plan accounts and indirectly loan the proceeds to the company. *Id.* Acting pursuant to powers set forth in the trust documents, the company directed the bank to make the loans to the participants on their requests. *Id.* Accordingly, FirsTier prepared the loan documents, obtained the participants' signatures on the documents necessary to process the participants' requests, and disbursed the loan proceeds to the participants. *Id.* The participants in turn loaned their plan borrowings to the company, which later went into bankruptcy. *Id.* None of the participants' loans to the company was repaid and the participants thus lost their plan account savings. *Id.* FirsTier brought an action seeking declaratory judgment. *Id.*

On appeal from a district court decision in FirsTier's favor, the participants claimed that FirsTier was liable for their losses because it had breached its fiduciary duty to act prudently under ERISA by processing the participants' own loan requests without first investigating the underlying purpose of their loans. *Id.* at 912. The participants argued that FirsTier had a "duty to inquire" into the purpose of the loans. *Id.* Because the bank recently had rejected an improper attempt by the sponsor president to substitute himself as trustee and knew the sponsor was in grave financial distress, there were red flags that put FirsTier on notice that the participants may have requested the loans to lend money to the sponsor and, thus, that processing their loan requests posed a significant risk that they could lose their money. *Id.* The participants claimed that had FirsTier investigated the purpose of their loan requests it would have discovered that the sponsor president had coerced the participants to transfer the loan proceeds to the sponsor so that it could pay down its debt to FirsTier and that the situation created a conflict of interest for

FirsTier as both plan trustee and creditor of the sponsor. *Id.* They further contended that once informed, FirsTier as trustee would have refused to make the loans. *Id.*

The Eighth Circuit held that FirsTier had fiduciary duties with respect to loan requests.[8] However, the court held that FirsTier did not breach these duties under ERISA because "[w]hen acting at the direction of the ultimate beneficiary of a trust, the trustee's fiduciary duty is satisfied if it simply complies with a direction that does not violate the terms of the trust." *Id.* at 912. The court found that there was nothing in ERISA "suggesting that, to be prudent, a trustee must ask [participants] . . . the purpose for which they are lawfully borrowing their share of the plan's assets." *Id.* "Because FirsTier obeyed the Plan and the statute, the Participants may not shift to FirsTier responsibility for their own subsequent loss of the loan proceeds, or for the unknown misdeeds of another fiduciary, [the company's president]." *Id.* at 913.

The reasoning of *FirsTier* applies here. Even if this Court were to conclude that Putnam were a fiduciary with respect to the processing of distribution requests made by Plan participants, as a matter of law, Putnam cannot be held liable for plaintiffs' losses. This is the case because, even if the plaintiffs' Direct Rollover Request Forms contained purported "red flags,"[9] Putnam was not required to look behind the directions of Plan participants – the "ultimate beneficiaries" – or to question the prudence of participants' decisions. Just as in *FirsTier,* notwithstanding alleged red flags or warning signals, the participants here were requesting the trustee to process a transaction – here a direct IRA rollover distribution; there a participant loan – that the Plan

---

[8] The Eighth Circuit has since qualified its position on when fiduciary responsibility may be imposed on a trustee and has held unequivocally that discretionary authority or control over assets *is* required to establish ERISA fiduciary status. *See, e.g., Maniace v. Commerce Bank, N.A.,* 40 F.3d 264, 267 (8th Cir.1994) ("discretion is the benchmark for fiduciary status under ERISA").

[9] Putnam does not concede that the direct IRA rollover request forms plaintiffs submitted to Putnam in this case exhibited "red flags." However, Putnam's Summary Judgment Motion does not require that issue to be addressed.

permitted.  *Id.* at 912-913; *see also Griggs v. E. I. Dupont de Nemours & Co.,* 237 F.3d 372, 381

(4th Cir. 2001) ("ERISA does not impose a general duty requiring ERISA fiduciaries to ascertain

on an individual basis whether each beneficiary understands the collateral consequences of his or

her particular election.").  Moreover, Putnam had no duty to assume duties outside the

requirements of Plan documents.  *See, e.g., Dzinglski v. Weirton Steel Corp.,* 875 F.2d 1075,

1080 (4th Cir. 1989) (holding that a fiduciary must carry out its duties in accordance with a

plan's documents and that "[t]o adhere to plan is not a breach of fiduciary duty").

## IV. Even if All the Elements of a Breach of Fiduciary Duty Claim Were Present, Plaintiffs' Claims are Barred by the Statute of Limitations

ERISA provides a three-year statute of limitations for claims alleging breach of fiduciary

duty.  29 U.S.C. § 1113(2).  The limitations period begins to run when the plaintiff has "actual

knowledge" of the defendant's alleged breach.  *Id.*

The Fourth Circuit and a number of district courts in this Circuit have interpreted "actual

knowledge" broadly.  Some decisions have held that a plaintiff has actual knowledge of the

breach when he becomes aware of the facts or the transaction that constituted the alleged breach.

*See, e.g., Adams v. Brinks's Co.*, 261 F. App'x. 583, 555 (4th Cir. 2008) (actual knowledge of a

breach of fiduciary under ERISA was provided on the dates when plaintiffs received letters

contradicting previous communications, because "these communications should have put [them]

on notice that there had been previous misrepresentations.") (a copy of this decision is attached

hereto as Exhibit C); *Trace v. Retirement Plan for the Salaried Employees of Merck & Co.*, 419

F. Supp. 2d 846, 848 (E.D. Va. 2006) ("The relevant knowledge for triggering the statute of

limitations is knowledge of the facts or transaction that constituted the alleged violation.

Consequently, it is not necessary for a potential plaintiff to have actual knowledge of every last

detail of a transaction.") (internal quotations omitted).  Other decisions suggest that "actual

knowledge" constitutes knowledge both of the facts or transaction that constituted the alleged breach and of the harmful consequences. *See Shofer v. Stuart Hack Co.*, 970 F.2d 1316, 1318 (4th Cir. 1992) (plaintiff had actual knowledge of his claim against plan Administrator, who had failed to provide plaintiff with information concerning the tax consequences of his loan, on the date when plaintiff learned his loan carried tax consequences).

The Fourth Circuit recently addressed both approaches in *Browning v. Tiger's Eye Benefits Consulting,* 313 F. App'x. 656, 661 (4th Cir. 2009) (a copy of this decision is attached hereto as <u>Exhibit D</u>), but declined to choose one over the other.  In *Browning*, the plan trustees sued the plan's third party administrative consultant and its sole shareholder, an accountant, for breach of fiduciary duty after the accountant introduced the plan trustees to an investment that turned out to be a Ponzi scheme.  *Id.* at 658-659.  The district court granted summary judgment after finding that the defendants were not fiduciaries and that the statute of limitations had expired.  *Id.* at 659.  The Fourth Court affirmed on the latter ground.  *Id.* at 662.  The Court concluded that the plaintiff trustees had actual knowledge of the alleged breach by the date on which they learned that the company in which the plan had invested had been placed in receivership.  *Id.* at 661-662.  By that date, which was more than three years before the suit was filed, the trustees had knowledge of the transaction's harmful consequences.  *Id.* at 662.  The court also found that the trustees likely had actual knowledge prior to that date, pointing to the trustees' knowledge, on the date of purchase of the promissory note, that their investment was not diversified, as well as the trustees' knowledge "of facts demonstrating that the Plan's money was not invested in an insured, 180-day promissory note, as they originally believed to be the case."  *Id.*  Similar to plaintiffs in *Browning,* plaintiffs here had both knowledge of the material facts that constitute Putnam's alleged breach of fiduciary – Putnam processed their requests –

*and* knowledge of the harmful consequences – Jones stole their money – more than three years before they filed suit.

### A. Plaintiffs Had Actual Knowledge Of The Material Facts That They Claim Constitutes Breach Of Fiduciary Duty Before October 4, 2004

Plaintiffs had actual knowledge that Putnam followed their instructions and rolled over their Plan account balances to BAB, a concert production company, well before October 4, 2004, three years prior to commencement of suit.[10] Plaintiffs knew before they executed the Direct Rollover Request Forms that BAB was a concert production and promotion company. PAPP, Tab 156. Between May 2003 and August 2004, after they submitted their Direct Rollover Request Forms to Putnam, twenty-six of the 31 plaintiffs also executed contracts ostensibly with BAB to co-produce concerts. *Id.*

Plaintiffs also knew that they had not established IRA accounts with BAB. They never received any literature concerning BAB as an IRA trustee, they did not complete applications to establish IRA accounts with BAB, they never received any form of confirmation that a IRA account had been established in their names at BAB, and they never received account statements from BAB. *Id.* Indeed, the only document they ever signed regarding BAB states that they were financing and co-producing concerts. PAPP, Tabs 83-94, 126-151.

Plaintiffs finally knew before October 4, 2005 that Putnam had processed their Direct Rollover Request Forms containing the so-called "red flags." Between May 2003 and May 2004, each plaintiff either signed a Direct Rollover Request Form showing BAB as the institution that would receive the rollover distribution, or they signed a blank Direct Rollover Request Form knowing that Jones would later name BAB on the form as the institution that

---

[10] Plaintiff Curtis Barnes filed his claim on March 13, 2009. His claim, brought two years after the rest of plaintiffs, is barred under the three-year statute of limitations for the same reasons discussed herein.

would receive the rollover distribution. PAPP, Tab 157. Plaintiffs then received copies of the completed and signed Direct Rollover Request Form showing either "BAB Inc." or "B.A.B. Inc." as the institution that would receive the rollover distribution. PAPP, Tabs 95-125, 157. Nineteen of the 31 plaintiffs received copies of completed and signed Direct Rollover Request Form that did not contain an account number on the form line that reads "Account number (if available)." PAPP, Tabs 95-125. Plaintiffs' copies of the Direct Rollover Request Forms also contained on the "IRA Name" line of the form the names "Closed-End Limited Partnership," "Closed-End Partnership," "BAB Closed-End Partnership," "BAB Closed-End Limited Partnership," "BAB Unit Investment Trust," and "Closed-End Unit Investment Trust." PAPP, Tabs 95-125. After the forms were submitted to Putnam, between May 2003 and May 2004, plaintiffs then received written confirmations from Putnam, and/or a copy of the distribution check stub from Jones, indicating that Putnam had distributed the balances of their Plan accounts to BAB. PAPP, Tabs 49-81, 157. Between May 2003 and August 2004, 16 of the 31 plaintiffs then executed contracts with BAB that they believed were funded with their distributed Plan account funds, and another 10 plaintiffs executed contracts in amounts almost equal to the amounts of their rollover distributions. PAPP, Tabs 126-151, 157.

There can be no question that plaintiffs knew before October 4, 2004 (i) that Putnam distributed the balance of plaintiffs' Plan accounts to BAB; (ii) that Putnam had processed plaintiffs' Direct Rollover Request Forms containing what are now alleged to have been "red flags"; and (iii).that BAB was a concert promotion and production company and not an IRA trustee. Such knowledge constitutes "actual knowledge" of the material facts underlying their claim of breach of fiduciary duty. Accordingly, plaintiffs' claim is barred by the 3-year statute of limitations.

**B.     Plaintiffs Had Actual Knowledge Of The Consequences Of Their Decisions In September 2004**

In addition, *all* plaintiffs learned by the end of September 2004 that they had lost their money to a Ponzi scheme. By the end of September 2004, all of the plaintiffs' monthly payments ostensibly from BAB had ceased completely. PAPP, Tabs 160-190. Either from word-of-mouth, television news, or the September 22, 2004 Rocky Mount Telegram, all of the plaintiffs had learned in September 2004 that (i) the North Carolina Secretary of State had issued a summary cease and desist order against Jones and "shut down" his business due to fraud against his clients; (ii) authorities had arrested Jones and raided his office; (iii) authorities believed Jones had operated a Ponzi Scheme and had stolen the money his clients had instructed Putnam to rollover to BAB; and (iv) authorities believed BAB was a sham. PAPP, Tab 158. In response to this information, many plaintiffs demanded the return of their money from Jones, but received nothing. *Id.* Plaintiffs therefore had actual knowledge of the consequences of Putnam's processing of their Direct Rollover Request Forms and distribution of their Plan account funds to BAB before October 4, 2004. Accordingly, their claim is barred by the 3-year statute of limitations on this ground as well.

## CONCLUSION

For the foregoing reasons, Putnam respectfully requests that the Court grant summary judgment in its favor.

This 17th day of July, 2009.

<div style="margin-left:50%">

/s/ Matthew W. Sawchak
Matthew W. Sawchak
N.C. State Bar No. 17059
George F. Sanderson III
N.C. State Bar No. 33054
ELLIS & WINTERS LLP
P.O. Box 33550
Raleigh, NC  27636
(919) 865-7000
Fax (919) 865-7010
matt.sawchak@elliswinters.com
george.sanderson@elliswinters.com

James S. Dittmar
Damian W. Wilmot
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Telephone:  617.570.1000
Facsimile:  617.523.1231
jdittmar@goodwinprocter.com
dwilmot@goodwinprocter.com

Attorneys for Putnam Fiduciary
Trust Company

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that today, I electronically filed the foregoing document with the Court's

CM/ECF system, which will serve the filing on the following counsel:

J. Anthony Penry, Esq.
Neil A. Riemann, Esq.
PENRY RIEMANN, PLLC
510 Glenwood Avenue, Suite 319
Raleigh, NC 27603
andy.penry@penryriemann.com
neil.riemann@penryriemann.com

Howard B. Prossnitz, Esq.
Meaghan M. McCallister, Esq.
LAW OFFICES OF HOWARD PROSSNITZ
200 West Madison Street
Suite 2670
Chicago, IL 60606
howard@prossnitzlaw.com
meaghan@prossnitzlaw.com

Robert M. Birndorf, Esq.
Birndorf & Birndorf
200 West Madison St., Suite 2670
Chicago , IL 60606
rbirndorf@cs.com

*Attorneys for Plaintiffs*

Joseph J. Torres, Esq.
Sheila P. Frederick, Esq.
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
jtorres@winston.com
sfrederick@winston.com

Sara W. Higgins, Esq.
HIGGINS LAW FIRM, PLLC
5950 Fairview Road
Charlotte, NC 28210
sally@thehigginslawfirm.com

*Attorneys for Defendant Abbott Laboratories, Inc.*

I further certify that today, I have mailed the document to the following non-participants in

CM/ECF:

Wayne R. Williams, Esq.
152 Spaulding Drive
Rocky Mount, NC 27801
*Attorneys for Plaintiffs*

Eric D. Levine, Esq.
301 S. McDowell Street, Suite 1010
Charlotte, NC 28204
*Attorney for Defendant BAB Productions, Inc.*

Mr. Joseph Lionel Jones
c/o North Carolina Department of Corrections
Caledonia Corrections Institution
Box 137
Tillery, NC 27887

This 17th day of July, 2009.

/s/  George F. Sanderson III