IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:07-CV-386-H(2)

RONALD ARRINGTON et al.,            )
                                    )
        Plaintiffs,                 )
                                    )
                                    )
                                    )
                                    )
    v.                              )
                                    )
                                    )                **ORDER**
                                    )
                                    )
PUTNAM FIDUCIARY TRUST              )
COMPANY, ABBOTT LABORATORIES,       )
INC., JOSEPH LIONEL JONES and       )
BAB PRODUCTIONS, INC.,              )
                                    )
        Defendants.                 )


This matter is before the court on separate motions for summary judgment filed by defendants Abbott Laboratories, Inc. ("Abbott") and Putnam Fiduciary Trust Company ("Putnam") as well as a joint motion to strike plaintiffs' jury demand filed by Putnam and Abbott. Appropriate responses and replies have been filed, and the time for further filings has expired. These motions are ripe for adjudication.

Abbott is a diverse company with a variety of healthcare products, including pharmaceuticals, nutritionals, diagnostics tests, and medical devices. Plaintiffs are retirees of Abbott who participated in a defined contribution Stock Retirement Plan ("the Plan") sponsored by Abbott.[1]  Under the terms of the Plan, Abbott had the right to delegate certain functions to third parties.  On January 1, 1996, Abbott outsourced administration of the Plan to Putnam.  As part of this delegation, Abbott and Putnam entered into two agreements (1) a Trust Agreement; and (2) a Service Agreement.  The Trust Agreement appointed Putnam as trustee of the Plan, and the Service Agreement outlined Putnam's duties and responsibilities with respect to the management of the Plan.  Putnam maintained qualified retirement accounts for each of the plaintiffs, and Putnam's duties under the Service Agreement included, inter alia, processing participant withdrawals, loans, investment changes, and rollover distribution requests.  Abbott paid Putnam a base recordkeeping

---

[1] Defined contribution plans provide individual accounts that define a participant's benefits according to the amount contributed to the participant's account and any income, expenses and investment gains or losses allocated to the account.  See 29 U.S.C. § 1002(34) (defining "defined contribution plan").

fee of $16 per participant per year, plus an additional amount based on the plan's year-end assets.

After delegating administration to Putnam in 1996, Abbott played no role in processing rollover distribution requests. Abbott did review Putnam's duties on an ongoing basis and discuss its performance generally in regular meetings. Abbott specifically met with Putnam once a year to discuss investment performance and planning regarding administrative functions. Abbott also received and reviewed various reports from Putnam.

More specifically, plaintiffs are thirty-one retirees who worked as production workers at the Abbott Manufacturing facility in Rocky Mount, North Carolina. From 2003 to 2004, plaintiffs fell victim to a Ponzi scheme concocted by defendant Joseph Lionel Jones ("Jones") who duped plaintiffs out of more than $4 million after Jones convinced them to transfer their retirement savings from the Plan to a purported investment that Jones recommended.

At Jones' instruction, each of the plaintiffs signed Direct Rollover Request Forms authorizing Putnam to transfer their retirement funds to what plaintiffs believed was an IRA. The forms submitted by plaintiffs listed the IRA name as "Closed-End Unit Investment Fund" and the institution serving as trustee and custodian of the IRA as "B.A.B. Inc. Send Fed Ex Acct #2455-

3

8445-8." Based on these instructions, Putnam liquidated each of the plaintiffs' accounts and distributed the monies to B.A.B., Inc.[2] Plaintiffs allege that defendant Putnam breached its fiduciary duties by processing these forms without question.

Plaintiffs allege that Abbott allowed Jones, who was not a registered securities dealer or salesman, to regularly visit Abbott's Rocky Mount plant where plaintiffs worked and to attend company retirement parties where he solicited investors for his Ponzi scheme. (Second Am. Compl. ¶ 3.)

Jones has since been convicted of numerous counts of state securities law violations and obtaining property by false pretenses. He is currently serving a sentence of twenty to twenty-six years in the North Carolina Department of Correction.

Plaintiffs filed this action on October 9, 2007, alleging that Abbott and Putnam breached fiduciary duties they owed plaintiffs under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA").

---

[2] B.A.B., Inc. was a "rock concert production company" that Jones was using as a front for his Ponzi scheme.

4

## I. Standard of Review

Summary judgment is appropriate pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

## II. Fiduciary Relationship

ERISA requires that fiduciaries act "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The duties of care and integrity demanded of a plan fiduciary originate in the common law of trusts and are "among the highest, if not the very highest, known to the common law." Edmonds v. Hughes Aircraft Co., 145 F.3d 1324, *8 (4th Cir. 1998) (unpublished).

"Fiduciary" is defined by ERISA to include those individuals or entities involved in the management, administration and investment of plan assets, but only to the extent they exercise discretionary authority or control over the management or

6

administration of the plan. 29 U.S.C. § 1002(21)(A); DiFelice v.
U.S. Airways, Inc., 497 F.3d 410, 417 (4th Cir. 2007). Fiduciary
status is not an "all-or-nothing concept." Coleman v. Nationwide
Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992). "[A] party is a
fiduciary only as to the activities which bring the person within
the definition." Id. Thus, courts focus on the function
performed by a party in determining whether the party has
exercised the requisite discretion and "owes fiduciary duties
with regard to particular conduct." DiFelice, 497 F.3d at 418.
"Determining a defendant's level of discretion is a fact-specific
inquiry." Abbott v. Duke Energy Health & Welfare Ben. Plan, No.
3:07-CV-110, 2007 WL 2300797 *3 (W.D.N.C. 2007). In addition to
considering a plan's language, a court "'should look to the
party's actions to determine if the party, in fact, exercised
discretionary authority.'" Id.

### III. Putnam

The Service Agreement between Abbott and Putnam provided
that Putnam would process participant-directed distribution of
assets in individual participant accounts. (Abbott-Putnam
Service Agreement [DE 82-3].) Putnam received a $10 fee for
each distribution it processed. (Id., § III(B)(2).)

Plaintiffs argue that Putnam was a fiduciary with respect
to its processing of plaintiffs' rollover requests and that it

breached this duty by not meeting the prudent man standard in processing the requests. Putnam's memorandum lays out in detail the process followed by Putnam in processing the forms, including that each form was reviewed to see if it was in "good order," meaning that the technical administrator looked to see: (1) if the form was filled out completely, with no confusion as to what the participant is requesting; (2) if a direct rollover is requested, is the direct rollover form also attached; and, (3) if the form is signed by the participant. (Abbott Labs Operations Manual [DE 82-4], at 315—316.)

The "good order" review included reviewing the form to make sure there was no missing, questionable or unclear information. "Missing information" meant that the participant failed to sign his distribution request forms. (McMorrow Dep. [DE #84] at 56.) "Questionable information" in the Operations Manual meant that the technical administrator could not discern how the participant wanted his Plan assets distributed because the participant's writing was illegible. (McMorrow Dep. at 57.) If a participant had after-tax money in his Plan account but failed to elect on the forms how he wanted it distributed, this would be considered "unclear information." (McMorrow Dep. at 57.) If there was missing, questionable or unclear information, as defined above, then the technical administrator forwarded the

8

distribution request to Putnam's call center, which would contact the participant to obtain the necessary information. (McMorrow Dep. at 57.)

Once a technical administrator confirmed that the form was in "good order" and entered the information into the computer program known as the PRIDE system, another administrator performed quality control; i.e., checked the information entered for correctness. (Cashman Dep. [DE #83] at 62; McMorrow Dep. at 63; Poirier Dep. [DE #85] at 27-28.) If a participant elected to rollover 100% of his Plan account to an IRA or new employer's 401(k) plan, Putnam liquidated the account holdings, segregated the assets to a distribution account, and generated and mailed a check to the entity for the benefit of the participant at the address indicated on the participant's Direct Rollover Request Form. (Aff. of Ronald Cashman [DE #81] ¶ 6.)

Deposition testimony shows that Putnam did not consider the propriety or prudence of a participant's distribution request. Technical administrators were trained not to question participants' directions to make plan distributions, as the Plan is a participant-directed plan and such transactions are permitted under the Plan. (McMorrow Dep. at 39-41, Poirier Dep. at 25-26, 36.) In regards to plaintiffs' rollover requests, there is no evidence that any of the technical administrators

9

who reviewed plaintiffs' direct IRA distribution forms found any "missing, questionable or unclear information" or concluded they were not in "good order."

Plaintiffs argue that Putnam was a fiduciary as to the processing of plaintiffs' rollover requests and that Putnam breached its fiduciary duty by processing these "defective" forms. Plaintiffs argue that there were three red flags showing the forms to be defective that Putnam ignored: (1) that the name of the investment "BAB Closed-End Partnership," "BAB Unit Investment Trust," "Closed-End Limited Partnership," and "Closed-End Partnership" were not "proper" names for an IRA in that they did not name an institution with a designation such as "trust company," "bank" or "fiduciary"; (2) that the form did not include an account number for the IRA; and (3) that the name on the "IRA Name" line of the form did not include the participant's own name.

Putnam responds by noting that these alleged red flags were not part of their "good order" review: (1) they did not investigate the identity of the rollover entity, rather they were looking for a legible name and proper mailing address; (2) the fact that there was no account number was common because often the account had not yet been established at the rollover entity; and (3) the fact that the participant's name was not

10

part of the IRA name was irrelevant since Putnam always made the checks payable to the entity "FBO [participant's name]." (Mem. Supp. Putnam Mot. Summ. J. [DE #80] at 14.)

Plaintiffs also argue that Putnam had discretion to refuse plaintiffs' rollover requests as is evidenced by the fact that Putnam did in fact do so after it was too late and the fraud was complete. Plaintiffs contend that after Jones was arrested, Putnam's internal emails recognize that it had the discretion not to honor rollover requests based on the "good order" requirement. However, the court has reviewed these emails in their entirety and finds that they actually support Putnam's argument that it lacked discretion to interfere with a participant's request. The emails note that in light of the Secretary of State's investigation of Jones and B.A.B., as part of their "good order" review when participants specify B.A.B. as rollover, Putnam would do a callout and refer the participant to the Secretary of State's office for information on the investigation of Joe Jones and B.A.B. However, the email also notes that the participant would be informed that Putnam will "process their distribution upon hearing back from them to either confirm or alter their rollover instructions." (Cashman email [DE 133-8].) An email in response to internal concerns about distributing participants' money to BAB in light of the

11

Secretary of State's investigation notes that "[g]enerally, [Putnam] can't interfere with a participant request, and wouldn't unless we know factually there is a problem with a payee." (Cashman-Williams email [DE 133-9].) Plaintiffs attempt to argue that these emails show that Putnam had "discretion" to stop the rollovers; however, a close reading shows that Putnam was required to do what the participant directed, even in the face of a Secretary of State inquiry. A courtesy call to the participant was added to the process, so that the participant could make an informed decision, but the email suggests that after the phone call, if a participant still wanted to send his money to BAB, Putnam would have been required to do so.

Putnam argues that it was not a fiduciary in regards to the processing of plaintiffs' rollover forms, and even if it were a fiduciary, it would not have been obligated to question plaintiffs' instructions.

This court need not decide whether Putnam was a fiduciary in regards to the processing of plaintiffs' rollover requests because even assuming fiduciary status, "[w]hen acting at the direction of the ultimate beneficiary of a trust, the trustee's fiduciary duty is satisfied if it simply complies with a direction that does not violate the terms of the trust."

12

FirsTier Bank, N.A. v. Zeller, 16 F.3d 907, 912 (8th Cir. 1994) (citing IIA Scott on Trusts § 185 at 574-575).

In FirsTier, the sponsor of a profit sharing plan was experiencing financial hardship and was indebted to FirsTier Bank, who was both the trustee of the sponsor's profit sharing plan and its commercial lender. Id. at 910. In an attempt to pay off the sponsor's debt to FirsTier and save the company, the president of the company had the sponsor's board of directors resolve to substitute the president of FirsTier as trustee of the Plan. Id. The president intended to free up cash by funding the existing plan accounts with annuities. Id. FirsTier, however, refused to accept its removal as plan trustee because it knew of the sponsor's serious indebtedness and feared misuse of plan assets. Id.

Days later, the sponsor's president convinced a number of plan participants to borrow from their plan accounts and indirectly loan the proceeds to the company. Id. Acting pursuant to powers set forth in the trust documents, the company directed the bank to make the loans to the participants on their requests. Id. Acting pursuant to this direction, FirsTier prepared the loan documents, obtained the participants' signatures on the documents necessary to process the participants' requests, and disbursed the loan proceeds to the

13

participants. Id. The participants in turn loaned their plan borrowings to the company, which later went into bankruptcy. Id. None of the participants' loans to the company was repaid, and the participants thus lost their plan account savings. Id.

FirsTier brought an action seeking declaratory judgment. Id. On appeal from a district court decision in FirsTier's favor, the participants claimed that FirsTier was liable for their losses because it had breached its fiduciary duty to act prudently under ERISA by processing the participants' own loan requests without first investigating the underlying purpose of their loans. Id. at 912. The participants argued that FirsTier had a duty to inquire into the purpose of the loans. Id. Because the bank recently had rejected an improper attempt by the sponsor president to substitute himself as trustee and knew the sponsor was in grave financial distress, there were red flags that put FirsTier on notice that the participants may have requested the loans to lend money to the sponsor in contravention of ERISA's prohibited transaction rules. Id. The participants claimed that had FirsTier investigated the purpose of their loan requests it would have discovered that the sponsor president had coerced the participants to transfer the loan proceeds to the sponsor so that it could pay down its debt to FirsTier and that the situation created a conflict of interest

14

for FirsTier as both plan trustee and creditor of the sponsor.
Id. They further contended that once informed, FirsTier as
trustee would have refused to make the loans. Id.

The Eighth Circuit held that FirsTier had fiduciary duties
with respect to loan requests.[3] However, the court held that
FirsTier did not breach these duties under ERISA because "[w]hen
acting at the direction of the ultimate beneficiary of a trust,
the trustee's fiduciary duty is satisfied if it simply complies
with a direction that does not violate the terms of the trust."
Id. at 912. The court found that there was nothing in ERISA
"suggesting that, to be prudent, a trustee must ask
[participants] . . . the purpose for which they are lawfully
borrowing their share of the plan's assets." Id. "Because
FirsTier obeyed the Plan and the statute, the Participants may
not shift to FirsTier responsibility for their own subsequent
loss of the loan proceeds, or for the unknown misdeeds of
another fiduciary, [the company's president]." Id. at 913.

The court adopts the reasoning of FirsTier, and applying it
to the instant case, finds that Putnam did not breach any duty
it might have had because it complied with the Plan terms and
the Plan participants' directions. Even assuming that Putnam
was a fiduciary in regards to the processing of rollover

---

[3] See also Maniace v. Commerce Bank, N.A., 40 F.3d 264, 267 (8ᵗʰ Cir. 1994)
(noting that "discretion is the benchmark for fiduciary status under ERISA"
and distinguishing the court's finding of fiduciary duty in FirsTier).

15

requests, under the circumstances presented here its duties did not extend to looking behind the direction of the participants or to question the prudence of their selection of rollover entities.[4] "When Putnam receives properly completed distribution forms from the Participant, it will distribute the benefit according to the Participant's directions." (Service Agreement § II(D)(7) [DE 82-3].)

## IV. Abbott

In its second amended complaint, plaintiffs allege that Abbott allowed Joe Jones, who held himself out as an investment advisor, to regularly attend retirement parties at the Abbott Rocky Mount facility. (Second Am. Compl. ¶ 3.) Further, they allege that Jones was the only purported financial advisor who regularly attended retirement parties where he solicited Abbott employees to entrust their retirement funds to him. (Second Am. Compl. ¶ 3.) The evidence does not bear out these allegations, despite plaintiffs' contention in its response that there is a factual issue as to how many retirement parties he attended. At most, it appears that Jones attended two or three retirement parties and that he attended these parties as a guest of the retiree, not as a financial advisor. There is no evidence that anyone invested with Jones because he attended the retirement

---

[4] The court does not decide whether Putnam would have had a duty to warn participants if they had actual knowledge of the fraud because those circumstances are not present here.

parties. Even if his presence as a guest somehow made him appear credible to some of the Abbott retirees, there is absolutely no evidence that Abbott invited him to the parties or knew of any reason to exclude him from the plant as an invited guest of a retiree. There is no evidence that Jones ever gave any type of presentation at any meeting or party at Abbott.

In their response to Abbott's motion for summary judgment, plaintiffs appear to recognize that the retirement party attendance argument is weak, and plaintiffs now attempt to "pin the blame" on Jane Tyson, Human Resources employee for Abbott. In summary, they argue that Jane Tyson should have warned plaintiffs not to invest with Jones because they might lose their money. They argue that because she failed to "speak up" that there is a fact issue as to whether Abbott has independent liability as a fiduciary. Their "evidence" against Tyson basically amounts to the fact that she planned retirement seminars, had a stack of business cards of investment advisors if people asked for a recommendation (which did not include Jones), that she did not like Jones personally, that she thought Jones' advice would lead to people running out of money quickly and that she was not aware of any written policy of Abbott's which forbid her from warning employees about Jones.

17

Abbott responds that (1) Tyson was not a fiduciary and (2) even if she was, she had no information about Jones she was required to disclose. This court agrees. Tyson was a Human Resources Specialist at the Rocky Mount facility from 1977 until her retirement in 2004. Tyson performed ministerial tasks related to Abbott's employee benefit plans. "Ministerial administrative acts are not fiduciary acts." Adams v. Brink's Co., 261 F. App'x 583, 2008 WL 142771 (4th Cir. 2008) (citing HealthSouth Rehab. Hosp. v. Am. Natl' Red Cross, 101 F.3d 1005, 1009 (4th Cir. 1996).) She assisted employees with filling out forms, answered employees' questions and helped them solve benefit problems. Tyson was not a manager at the Rocky Mount facility. She was not a named fiduciary under the plan, never exercised any discretion in how the plan was administered or managed, and had no authority to establish, amend or contradict the terms of any Abbott benefit plan. None of her activities show that Tyson "exercise[d] any discretionary authority or discretionary control respecting management of such plan or exercise[d] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Furthermore, even assuming she is a fiduciary, plaintiffs fail to show that Tyson knew Jones was defrauding Abbott employees or that Jones' actions were illegal. While the evidence shows

18

Tyson did not like Jones personally, there is no evidence that she knew he was running a Ponzi scheme or was selling securities without a license. Because she could not have disclosed information she did not have, Abbott cannot be held liable for such alleged nondisclosure.

Plaintiffs also argue that Abbott is liable as a co-fiduciary to Putnam for failing to properly monitor Putnam's handling of rollover forms. See 29 U.S.C. § 1105 (governing liability for breach of co-fiduciary). Having found that Putnam did not breach any fiduciary duty it may have owed to plaintiffs, plaintiffs' argument attempting to hold Abbott liable as a co-fiduciary must fail as a matter of law.

## CONCLUSION

This court is very saddened that the plaintiffs were defrauded out of money they had worked so hard to save for their retirement. However, the villain here is Joe Jones, not Putnam and not Abbott. As much as the court would like to remedy the wrong inflicted upon plaintiffs, it cannot hold Putnam and Abbott responsible for Jones' misdeeds simply because they, unlike Jones, are financially able to pay.

For the foregoing reasons, Abbott and Putnam's motions for summary judgment are GRANTED. All other pending motions are

deemed MOOT.[5] Remaining before the court for adjudication are plaintiffs' claims against defendants Joseph Lionel Jones and BAB Productions, Inc.

This 16th day of March 2010.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#26

---

[5] Abbott and Putnam also moved for summary judgment arguing that plaintiffs' claims are barred by the statute of limitations. The court need not reach this issue today in light of its findings on the merits of the fiduciary duty claims.